IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

TIMOTHY W. SAUNDERS,           )
                               )
        Petitioner,            )
                               )
v.                             )        CIVIL ACTION No. 10-00439-KD-C
                               )
Cynthia Stewart,               )
Warden of Holman Correctional Facility,  )
                               )
        Respondent.            )

## ORDER

Timothy Wade Saunders, a death row inmate at Holman Correctional Facility in Atmore,

Alabama, challenges the validity of his 2005 conviction in Baldwin County, Alabama Circuit

Court, for which the trial court sentenced Saunders to death by lethal injection. Respondent

Cynthia Stewart serves as Holman Correctional Facility's warden.[1] Below, the Court considers

Saunders's amended petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254.[2] As

the Court will explain, Saunders's amended petition is due to be **DENIED**.

## I.  Background

### A.  Facts of the Underlying Crime[3]

On July 9, 2004, Timothy Wade Saunders murdered 77-year-old Melvin Clemons and

severely injured Mr. Clemons' wife, Agnes Clemons. Earlier, Saunders borrowed a crowbar

---

[1] The Clerk of Court is **DIRECTED** to amend the style of the case to reflect the fact that the correct Respondent is Cynthia Stewart.
[2] Saunders' counsel filed a successful motion for leave to file an amended petition accompanied by the amended petition (Doc. 41) but failed to comply with Civil L.R. 15(c). Ala. S.D. Civil L.R. 15(c) ("If the Court grants the motion to amend, the party must promptly file the amended pleading."). As a result of the oversight, the Court will construe and refer to Doc. 41-1 as the Amended Petition.
[3] For the purpose of reciting the facts of the murder and assault, the Court relies upon the Alabama Court of Criminal Appeals' adjudication of Saunders' direct appeal. Saunders v. State, 10 So. 3d 53 (Ala. Crim. App. 2007) (Saunders I).

from Mr. Clemons. When Saunders failed to return the crowbar, Mr. Clemons left his house to go outside. He did not return. Later, Mrs. Clemons found Saunders sitting on the Clemons' porch. Noticing Saunders sweating profusely, Mrs. Clemons opened her door and asked Saunders if he was OK. He informed her that he was suffering an asthma attack. Mrs. Clemons took a glass of water and washcloth to him. Saunders asked to use her restroom, which Mrs. Clemons allowed him to do. Later, as Mrs. Clemons attempted to call Saunders's mother, as he requested, he approached her from behind. Saunders proceeded to rob, physically intimidate, and assault Mrs. Clemons. At one point, after dragging Mrs. Clemons throughout the home, repeatedly striking her, and blocking her from leaving the bathroom, Saunders smoked crack cocaine. He also unsuccessfully tried to play cards with Mrs. Clemons.  Then he asked her to pose provocatively, like the naked women depicted on the cards posed. She refused, telling "Saunders that she would fight him until she died; that he was not going to make her pose; and that she wanted to leave the bathroom because he was scaring her. Saunders then moved his leg and allowed her to leave the bathroom." Saunders v. State, 10 So. 3d 53, 64 (Ala. Crim. App. 2007) (Saunders I).

Mrs. Clemons managed to call police after breaking free and obtaining a shotgun. Saunders fled. At 9:48 that night, Mrs. Clemons telephoned 911. Police arrived to find Mr. Clemons'

> body approximately 50 to 75 yards from the residence, near a hedgerow that separated the Clemons['] property from a mobile home park. Mr. Clemons appeared to have sustained severe head wounds and was dead when the officers found him. One of the pockets on Mr. Clemons's pants was turned inside out and there appeared to be an area of blood on the pocket. An opened knife sheath was on Mr. Clemons's belt, and a folded or unopened knife was found under Mr. Clemons's body. In addition, a crowbar with what appeared to be blood, tissue, and hair on it was found on the back patio, leaning against the Clemons['] house.

Id. at 65-66.

Dr. Kathleen Enstice, who performed the autopsy on Mr. Clemons' body, concluded Mr. Clemons' cause of death was blunt-force trauma to the head. The injuries Mrs. Clemons sustained resulted in her hospitalization for several days. She suffered a concussion, severe bruising, and pulmonary contusions. The following day, she experienced heart failure. She spent a portion of her hospitalization in the intensive-care unit.

## B. Trial Court Proceedings and Saunders's Conviction and Sentence

A Baldwin County, Alabama grand jury indicted Saunders in a five-count indictment:

> robbery-murder, a violation of section 13A-5-40(a)(2) of the Code of Alabama (1975), and burglary-murder, a violation of section 13A-5-40(a)(5)[;] one count of attempted murder, a violation of sections 13A-4-2 and 13A-6-2; one count of attempted rape, a violation of sections 13A-4-2 and 13A-6-61(a)(1); and one count of burglary, a violation of section 13A-7-5.

(Doc. 47 (Respondent's Response) at 20) (citing 41-46 (Timothy W. Saunders's Indictment) at 19).[4] Two court-appointed attorneys, Thomas Dasinger and Samuel Jovings ("trial counsel"), represented Saunders during the trial. Saunders initially pleaded not guilty by reason of mental defect, but later that plea was withdrawn, and he pleaded not guilty. (Doc. 41-46 at 10-11).

Trial began on or about August 24, 2005. (Id. at 8). Saunders testified as the only witness for the defense. The case was submitted to the jury on August 26, 2005. (Id. at 8.) The jury convicted Saunders of both capital murder counts (robbery-murder and burglary-murder) and of attempted murder. It acquitted Saunders of attempted rape. (Id. at 8; id. at 142-45).

The penalty phase began on August 31, 2005. (Id. at 9; id. at 146). Saunders presented four witnesses during the penalty phase: Saunders's sister, a correctional officer, a clinical psychologist, and a social worker. (Doc. 47 at 21-22). The jury unanimously recommended

---

[4] For the purpose of clarity, the Court will cite to the document and page number *as it appears on this Court's CM/ECF*. As an example, the Respondent's Response is Document 47. If the Court cites to the fifth page of the Respondent's Response it will appear as "(Doc. 47 at 5)."

Saunders be sentenced to death.[5] The trial court subsequently sentenced Saunders to die by lethal injection. (Doc. 41-25 at 21).

### C. Procedural Background

Following imposition of sentence, trial counsel successfully moved to withdraw in open court. (Doc. 41-25 at 22-23; Doc. 41-46 at 195-96). On December 21, 2008, the CCA affirmed Saunders's convictions and sentence. Saunders I, 10 So. 3d 53. The Alabama Supreme Court denied his petition for writ of certiorari. (Doc. 41-33 at 2). The United States Supreme Court also denied Saunders's petition for writ of certiorari, on May 26, 2009. Saunders v. Alabama, 129 S. Ct. 2433 (2009) (mem.).

The Respondent described Saunders's postconviction proceedings as "Gordian in their travels through the various courts." (Doc. 47 at 26). This apparently resulted from an administrative mishap. The parties first became aware of the state circuit court's summary dismissal of Saunders's first petition for postconviction relief on July 9, despite the court issuing the order on February 11. (Doc. 47-6 at 22-23, ¶ 4). Saunders filed an unopposed motion for an out-of-time appeal. (Id. at 2-37). The CCA dismissed the appeal in June 2011, concluding the petition was void due to Saunders neither paying a filing fee nor applying to proceed *in forma pauperis*.

Saunders then filed a second Rule 32 petition, which was both an out-of-time appeal and unopposed. Finally, Saunders filed a third Rule 32 petition. (Id. at 327). The CCA ordered this petition to be held in abeyance pending the conclusion of Saunders's second appeal. (Id. at 334).

The CCA consolidated all three Rule 32 petitions for appeal. (Id. at 336). It affirmed the circuit court's summary dismissal of Saunders's Rule 32 petition. (Doc. 41-41 at 2-45; Saunders

---

[5] The penalty phase took place shortly after Hurricane Katrina made landfall. On August 31, 2005, the first and only day of the penalty phase, juror # 41 did not appear for court. As a result, the Court substituted another juror over Saunders' objection. (Doc. 41-15 at 17-18).

v. State, 249 So. 3d 1153 (2016) (Saunders II). The Alabama Supreme Court denied Saunders's petition for writ of certiorari on September 22, 2017. (Doc. 41-45 at 2).[6]

Saunders originally filed his petition for writ of habeas corpus in 2010, (Doc. 1), with a motion to hold the petition in abeyance pending ongoing state Rule 32 proceedings. (Doc. 2). The Respondent did not oppose Saunders's motion for stay and abeyance (Doc. 5), and the Court granted Saunders's motion. (Doc. 6). It later ordered the parties to file joint status reports. (Doc. 7). On October 8, 2017, Saunders's counsel requested the Court lift the stay and enter a scheduling order (Doc. 37), which the Court granted. (Doc. 39).

## II.  Overview of Relevant Law

### A.  28 U.S.C. § 2254 and AEDPA

Title 28 U.S.C. § 2254 governs the authority of the federal courts to consider applications for writs of habeas corpus submitted by state prisoners. Henderson v. Campbell, 353 F.3d 880, 889-90 (11th Cir. 2003). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254, and it became effective April 24, 1996. Id. AEDPA applies to all petitions filed after its effective date. Id. Since Saunders filed this petition after April 24, 1996, AEDPA applies. 28 U.S.C. § 2254(d) provides that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[6] As a result, the CCA's decision constitutes the "last reasoned decision[,]" which is the subject of habeas review. See McGahee v. Ala. Dep't of Corr., 560 F.3d 1252, 1261 n.12 (11th Cir. 2009).

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the Supreme Court recognized that "§ 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." <u>Id.</u> at 412.

A state-court decision is contrary to the Supreme Court's clearly established precedent "(1) if the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law, or (2) if the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent." <u>Stephens v. Hall</u>, 407 F.3d 1195, 1202 (11th Cir. 2005) (quoting <u>Bottoson v. Moore</u>, 234 F.3d 526, 531 (11th Cir. 2000)).

A state court decision involves an unreasonable application of Supreme Court precedent "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Williams</u>, 529 U.S. at 407. In addition, a state court decision results in an unreasonable application of Supreme Court precedent "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Id.</u>

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." <u>Wood v. Allen</u>, 558 U.S. 290, 301 (2010). As a result, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's ... determination.'" <u>Id.</u>, 558 U.S. at 301 (quoting <u>Rice v. Collins</u>, 546 U.S. 333, 342 (2006)).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits." Greene v. Fisher, 565 U.S. 34, 38 336 (2011) (citing Cullen v. Pinholster, 563 U.S. 170, 171 (2011)). The Act, as amended, presumes as correct all determinations of factual issues made by a state court and places the burden upon the petitioner of rebutting such a presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).

**B. Exhaustion and Procedural Default**

"The habeas statute requires applicants to exhaust all available state law remedies." Jimenez v. Fla. Dep't of Corr., 481 F.3d 1337, 1342 (11th Cir. 2007). This provides "state courts an opportunity to review and correct the claimed violations of his federal rights." Id. To exhaust the claims in state court, "a federal claim must be fairly presented to the state courts." McNair v. Campbell, 416 F.3d 1291, 1302 (11th Cir. 2005). The Eleventh Circuit requires "a petitioner present[] his claims to the state court 'such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation.'" Id. (quoting Kelley v. Sec'y Dept. of Corr., 377 F.3d 1317, 1344-45 (11th Cir. 2004)).

A claim is procedurally defaulted when the petitioner failed to *properly* exhaust his or her state remedies. Woodford v. Ngo, 548 U.S. 81, 92 (2006).

> Thus, if state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding.

Id. at 93 (internal citation omitted). "The purpose of this doctrine is to ensure that state prisoners not only become ineligible for state relief before raising their claims in federal court, but also

that they give state courts a sufficient opportunity to decide those claims before doing so." O'Sullivan v. Boerckel, 526 U.S. 838, 853 (1999) (Souter, J. concurring).

Although procedurally defaulted claims are generally barred from habeas review, certain exceptions exist. These exceptions include instances in which the petitioner demonstrates (1) both cause and prejudice or (2) fundamental miscarriage of justice. Bishop v. Warden, GDCP, 726 F.3d 1243, 1258 (11th Cir. 2013). See also Coleman v. Thompson, 501 U.S. 722, 750 (1991), holding modified by Martinez v. Ryan, 566 U.S. 1 (2012) ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."). "As a general matter, 'cause' for procedural default exists if 'the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" Bishop, 726 F.3d at 1258 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). "To establish 'prejudice,' a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different." Henderson, 353 F.3d at 892.

An alternative way to overcome the procedural default's general bar is by demonstrating a fundamental miscarriage of justice. This "narrowly-drawn[,]" Butts v. GDCP Warden, 850 F.3d 1201, 1211 (11th Cir. 2017), cert. denied sub nom. Butts v. Sellers, 138 S. Ct. 925 (2018), exception arises when a petitioner proves "'a constitutional violation that has probably resulted in the conviction of one who is actually innocent.'" Id. (quoting Hill v. Jones, 81 F.3d 1015, 1023 (11th Cir. 1996)) (brackets omitted). To successfully assert this argument on a sentencing-

phase claim, the petitioner must demonstrate "'but for constitutional error at his sentencing hearing, no reasonable juror could have found him eligible for the death penalty under [state] law.'" Id.

### C. Relevant Alabama State Court Procedural Rules

The Alabama Rules of Criminal Procedure and the Alabama Rules of Appellate Procedure govern the process by which a petitioner may seek direct and collateral relief in Alabama state courts. Those rules, in turn, apply to a petitioner's federal habeas claim because failure to abide by the rules may result in a claim's procedural default, thus barring habeas review. Because the CCA held several of Saunders's claims were procedurally defaulted, the Court provides a general overview of these relevant rules.

Alabama Rule of Criminal Procedure 32 applies to Post-Conviction Remedies. After a criminal defendant exhausts all direct appeals, Rule 32 offers rules that govern Alabama's collateral review process. Rule 32.1 defines the scope of remedies, and it provides that

> any defendant who has been convicted of a criminal offense may institute a proceeding in the court of original conviction to secure appropriate relief on the ground that:
> > (a) The constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.
> > (b) The court was without jurisdiction to render judgment or to impose sentence.
> > (c) The sentence imposed exceeds the maximum authorized by law or is otherwise not authorized by law.
> > (d) The petitioner is being held in custody after the petitioner's sentence has expired.
> > (e) Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:
> > > (1) The facts relied upon were not known by the petitioner or the petitioner's counsel at the time of trial or sentencing or in time to file a posttrial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;

(2) The facts are not merely cumulative to other facts that were known;

(3) The facts do not merely amount to impeachment evidence;

(4) If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and

(5) The facts establish that the petitioner is innocent of the crime for which the petitioner was convicted or should not have received the sentence that the petitioner received.

(f) The petitioner failed to appeal within the prescribed time from the conviction or sentence itself or from the dismissal or denial of a petition previously filed pursuant to this rule and that failure was without fault on the petitioner's part.

A petition that challenges multiple judgments entered in more than a single trial or guilty-plea proceeding shall be dismissed without prejudice.

ALA. R. CRIM. P. 32.1. Rule 32.2 specifies instances under which relief is unavailable to a petitioner. It provides as follows:

(a) Preclusion of Grounds. A petitioner will not be given relief under this rule based upon any ground:

(1) Which may still be raised on direct appeal under the Alabama Rules of Appellate Procedure or by posttrial motion under Rule 24; or

(2) Which was raised or addressed at trial; or

(3) Which could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b); or

(4) Which was raised or addressed on appeal or in any previous collateral proceeding not dismissed pursuant to the last sentence of Rule 32. 1 as a petition that challenges multiple judgments, whether or not the previous collateral proceeding was adjudicated on the merits of the grounds raised; or

(5) Which could have been but was not raised on appeal, unless the ground for relief arises under Rule 32.1(b).

(b) Successive Petitions. If a petitioner has previously filed a petition that challenges any judgment, all subsequent petitions by that petitioner challenging any judgment arising out of that same trial or guilty-plea proceeding shall be treated as successive petitions under this rule. The court shall not grant relief on a successive petition on the same or similar grounds on behalf of the same petitioner. A successive petition on different grounds shall be denied unless (1) the petitioner is entitled to relief on the ground that the court was without jurisdiction to render a judgment or to impose sentence or (2) the petitioner shows both that good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice.

(c) Limitations Period. Subject to the further provisions hereinafter set out in this section, the court shall not entertain any petition for relief from a conviction or sentence on the grounds specified in Rule 32.1(a) and (f), unless the petition is filed: (1) In the case of a conviction appealed to the Court of Criminal Appeals, within one (1) year after the issuance of the certificate of judgment by the Court of Criminal Appeals under Rule 41, Ala.R.App.P.; or (2) in the case of a conviction not appealed to the Court of Criminal Appeals, within one (1) year after the time for filing an appeal lapses; provided, however, that the time for filing a petition under Rule 32.1(f) to seek an out-of-time appeal from the dismissal or denial of a petition previously filed under any provision of Rule 32.1 shall be six (6) months from the date the petitioner discovers the dismissal or denial, irrespective of the one-year deadlines specified in the preceding subparts (1) and (2) of this sentence; and provided further that the immediately preceding proviso shall not extend either of those one-year deadlines as they may apply to the previously filed petition. The court shall not entertain a petition based on the grounds specified in Rule 32.1(e) unless the petition is filed within the applicable one-year period specified in the first sentence of this section, or within six (6) months after the discovery of the newly discovered material facts, whichever is later; provided, however, that the one-year period during which a petition may be brought shall in no case be deemed to have begun to run before the effective date of the precursor of this rule, i.e., April 1, 1987.

(d) Claims of Ineffective Assistance of Counsel. Any claim that counsel was ineffective must be raised as soon as practicable, either at trial, on direct appeal, or in the first Rule 32 petition, whichever is applicable. In no event can relief be granted on a claim of ineffective assistance of trial or appellate counsel raised in a successive petition.

ALA. R. CRIM. P. 32.2.

Rule 32.6(b) mandates each claim be specifically pleaded, with a clear and specific statement of the grounds upon which relief is sought. Rule 32.7(d) permits summary dismissal of petitions and provides that

If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set a date for hearing.

Under Alabama case law, as the CCA has held, "'Where a simple reading of the petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously *without merit* or is precluded, the circuit court may summarily dismiss that petition.'" Bryant v. State, 181 So. 3d 1087, 1102 (Ala. Crim. App. 2011) (emphasis in original) (internal brackets omitted) (quoting Bishop v. State, 608 So. 2d 345, 347-48 (Ala. 1992)). See also id. (quoting Hodges v. State, 147 So. 3d 916, 946 (Ala. Crim. App. 2007)) ("[A] postconviction claim is 'due to be summarily dismissed [when] it is meritless on its face[.]'").

Failure to conform to the aforementioned rules sometimes results in improper exhaustion and precludes habeas review. At times, the Respondent cites the CCA's holding with respect to these rules in order to argue Saunders's habeas review is precluded on certain claims Saunders raises.

### D. Ineffective Assistance of Counsel Habeas Review

Saunders raises multiple ineffective assistance of counsel claims. "The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment . . . ." Strickland v. Washington, 466 U.S. 668, 684-85 (1984). "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment . . . ." Id. at 685.

"When conducting an ineffectiveness review, the court's role 'is not to grade counsel's performance.'" Haliburton v. Sec'y For Dep't Of Corr., 342 F.3d 1233, 1243 (11th Cir. 2003) (quoting Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000)). Strickland, the landmark ineffective assistance of counsel case, sets a "high bar" for petitioners. Padilla v. Kentucky, 559 U.S. 356, 371 (2010). The present inquiry involves two components, both of which a petitioner must satisfy in order to successfully assert an ineffective assistance of counsel claim. As the Supreme Court has previously described,

A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. To establish deficient performance, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness. We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.

Wiggins v. Smith, 539 U.S. 510, 521 (2003) (internal citations, brackets, and quotation marks omitted). In order to show that the deficient performance prejudiced the defense, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. 668, 694 (1984).

Strickland's high bar, coupled with § 2254(d)'s deference, imposes an even higher bar. See Harrington v. Richter, 562 U.S. 86, 105 (2011) ("Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult."). As the Supreme Court has held

The standards created by Strickland and § 2254(d) are both "highly deferential," id., at 689, 104 S.Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, Knowles, 556 U.S., at 123, 129 S.Ct. at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Id.[7] The Eleventh Circuit has further elaborated on this difficult, but not insurmountable, burden stating that,

When faced with an ineffective assistance of counsel claim that was denied on the merits by the state courts, a federal habeas court "must determine what arguments or theories supported or, [if none were stated], could have supported, the state

---

[7] The "double deference" to the state court ruling applies to the performance, but not the prejudice, prong. See Daniel v. Comm'r, Alabama Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016) (citing Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring)).

court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." [Harrington, 562 U.S. at 102], 131 S.Ct. at 786. So long as fairminded jurists could disagree about whether the state court's denial of the claim was inconsistent with an earlier Supreme Court decision, federal habeas relief must be denied. Id., 131 S.Ct. at 786. Stated the other way, only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents" may relief be granted. Id., 131 S.Ct. at 786.

Johnson v. Sec'y, DOC, 643 F.3d 907, 911 (11th Cir. 2011). As a result of this difficult burden, "it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." Id.

The circuit court dismissed all of Saunders's ineffective assistance of counsel claims on the pleadings and without conducting an evidentiary hearing. The CCA affirmed. "Summary dismissals under Rules 32.6(b) and 32.7(d) are adjudications on the merits and subject to AEDPA review." Daniel v. Comm'r, Alabama Dep't of Corr., 822 F.3d 1248, 1260 (11th Cir. 2016). Thus, AEDPA requires the Court evaluate whether the CCA's determination was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1); Borden v. Allen, 646 F.3d 785, 817-18 (11th Cir. 2011), or if the CCA's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

To do so, the Court must follow Eleventh Circuit instructions in Borden: "examine the ineffective assistance of counsel allegations that were before the Court of Criminal Appeals under the standards set forth by AEDPA. ... That is, accepting as true the *facts* asserted in support of [petitioner's] ineffective assistance of counsel claims, did the Alabama Court of Criminal

Appeals unreasonably apply Strickland and its progeny?" Borden, 646 F.3d at 815 (emphasis in original).[8]

The Eleventh Circuit in Daniel confronted an ineffective assistance of counsel claim that the Alabama state courts had dismissed for failure to plead the claim with sufficient specificity. It addressed this summary dismissal under the following rubric:

> Thus, AEDPA requires us "to evaluate whether the Court of Criminal Appeals's determination that [Mr. Daniel's] relevant ineffective assistance of counsel claims were due to be dismissed for failure to state a claim with sufficient specificity under Rule 32.6(b) was 'contrary to, or involved an unreasonable application of, clearly established Federal law,'" Borden, 646 F.3d at 817-18 (quoting 28 U.S.C. § 2254(d)(1)), or whether it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). See also Powell v. Allen, 602 F.3d 1263, 1273 (11th Cir. 2010) (per curiam) ("AEDPA limits our review to whether the state court's determination that Powell failed to plead sufficient facts in his Rule 32 petition to support a claim of ineffective assistance of counsel was contrary to or an unreasonable application of Supreme Court precedent."). We must therefore answer two questions to resolve this habeas appeal. First, whether Mr. Daniel's second amended Rule 32 petition and its attached exhibits pleaded enough specific facts that, if proven, amount to a valid penalty phase ineffective assistance of counsel claim. Second, if we answer the first question in the affirmative, we must determine whether the Alabama Court of Criminal Appeals's decision to the contrary was unreasonable under § 2254(d).

Daniel, 822 F.3d at 1261. Here, the CCA similarly affirmed the summary dismissal of Saunders's ineffective assistance of counsel claims. However, it did so because, according to the CCA, Saunders's claims contained "no material issue of fact or law [that] would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings . . .[.]" ALA. R. CRIM. P. 32.7(d). The Court must determine whether the CCA's decision that Saunders's claims, as he presented in his Rule 32 petition, does not present a valid ineffective assistance claim was contrary to or an unreasonable application of clearly established

---

[8] Under Alabama law, the facts alleged in the habeas petition are assumed to be true. See Ex Parte Williams, 651 So. 2d 569, 572 (Ala. 1992).

federal law or whether it resulted in a decision based on an unreasonable determination of the facts in lights of the evidence presented.

### III. Petitioner's Claims[9]

#### A. Overview

Saunders's petition raises seventeen bases as grounds supporting the petition for relief. Two bases (ineffective assistance of counsel at both the guilt and penalty phase) include eight subclaims. Saunders presented his claims as follows:

1. MR. SAUNDERS WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF HIS TRIAL.
   a. Mr. Saunders's trial counsel was ineffective during the guilt phase because trial counsel failed to discover and present substantial mitigation evidence regarding his drug and alcohol use.
   b. Mr. Saunders's trial counsel was ineffective during the guilt phase because even if trial counsel's decision to call Mr. Saunders to testify during the guilt phase was made for strategic reasons, trial counsel's execution of that decision was ineffective at best, and, at worst, tended to establish the inference that Mr. Saunders was guilty of capital murder.
2. MR. SAUNDERS WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF HIS TRIAL.
   a. Mr. Saunders's trial counsel provided ineffective assistance at the penalty phase of the trial by failing to follow up with two individuals who wrote letters on Mr. Saunders's behalf, and to introduce those letters into evidence.
   b. Mr. Saunders's trial counsel provided ineffective assistance at the penalty phase of the trial by failing to follow up with Mrs. Clemons, who would have testified that she did not want Mr. Saunders to receive the death penalty.
   c. Mr. Saunders's trial counsel provided ineffective assistance at the penalty phase of the trial by failing to investigate and develop evidence of the extreme abuse Mr. Saunders experienced during his childhood, and his own mental illness and drug abuse.
   d. Mr. Saunders's trial counsel provided ineffective assistance at the penalty phase of the trial by failing to investigate and present to the jury evidence of the extreme abuse that Mr. Saunders experienced as a child.
   e. Mr. Saunders's trial counsel provided ineffective assistance at the penalty phase of the trial by failing to investigate and present to the jury evidence of Mr. Saunders's family's history of mental illness and substance abuse.
   f. Mr. Saunders's trial counsel provided ineffective assistance at the penalty phase of the trial by failing to investigate and adequately present evidence of Mr. Saunders's mental illness and drug and alcohol usage.

---

[9] For simplicity's sake, each ground Saunders raised is addressed in the same order his petition addressed them.

3. MR. SAUNDERS WAS DENIED DUE PROCESS BECAUSE THE COURT OF CRIMINAL APPEALS' HOLDING THAT THE TRIAL COURT COMPLIED WITH RULE 32 IS IN CONFLICT WITH PRIOR DECISIONS FROM THE ALABAMA COURT OF CRIMINAL APPEALS REQUIRING THE TRIAL COURT TO STATE ITS REASONS WHEN THE DENIAL OF A RULE 32 PETITION IS BASED ON THE COURT'S OWN KNOWLEDGE.
4. MR. SAUNDERS WAS DENIED DUE PROCESS DURING HIS TRIAL BECAUSE JURORS WERE IMPROPERLY EXCUSED FOR CAUSE.
5. THE IMPOSITION OF THE DEATH PENALTY IN THIS CASE CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT DUE TO MR. SAUNDERS'S MENTAL DISABILITY.
6. ALABAMA'S METHOD OF EXECUTION BY LETHAL INJECTION IS CRUEL AND UNUSUAL PUNISHMENT.
7. THE ALABAMA CAPITAL STATUTE IS UNCONSTITUTIONAL ON ITS FACE.
8. THE PROSECUTOR UTILIZED HER PEREMPTORY CHALLENGES IN A RACIALLY DISCRIMINATORY MANNER.
9. IT WAS ERROR TO DENY SUPPRESSION OF A STATEMENT.
10. THERE WAS IMPROPER TESTIMONY ABOUT A LINEUP.
11. THE CORONER TESTIFIED IMPROPERLY.
12. THE HOMICIDE WAS NOT HEINOUS AND CRUEL.
13. IT WAS ERROR TO DENY SUPPRESSION OF A YOUTHFUL OFFENDER FINDING.
14. THERE WAS INSUFFICIENT EVIDENCE TO CONVICT.
15. THE STATE PROSECUTOR USED IMPROPER ARGUMENT.
16. IT WAS ERROR TO REPLACE A JUROR.
17. THE TRIAL COURT MISLED THE SENTENCING JURY AS TO THE IMPORTANCE OF ITS RECOMMENDED SENTENCE.

**B. Analysis**

1. MR. SAUNDERS WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF HIS TRIAL.

Saunders argues his trial counsel "did not render reasonable effective legal representation during Mr. Saunders's capital murder trial and therefore denied Mr. Saunders his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." (Doc. 41-1 (Petitioner's Amended Petition) at 29). Saunders details two sub-claims related to the guilt phase. The Court addresses both below.

a. Mr. Saunders's trial counsel was ineffective during the guilt phase because trial counsel failed to discover and present substantial mitigation evidence regarding his drug and alcohol use.

Saunders's first ineffective assistance of counsel claim relates to trial counsel's performance during the guilt phase. Saunders alleges trial counsel rendered ineffective assistance in the investigation and resulting presentation of information that might have served to mitigate his guilt. Specifically, Saunders claims that his trial counsel inadequately investigated his substance abuse, an investigation he dubs "trifling[.]" (Id. at 34, ¶ 60). He also faults trial counsel for failing to present any evidence of mitigation evidence regarding Saunders'sdrug and alcohol abuse, an amount he describes as "paltry[.]" (Id.).

The CCA held on collateral appeal that there was no material issue of fact or law within this claim that would entitle Saunders to relief. It therefore upheld the circuit court's summary dismissal of this claim, citing Alabama Rule of Criminal Procedure 32.7(d) (providing that "[i]f the court determines that [if] no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition").

First, it held that "[t]he record clearly shows that Saunders's trial counsel did present a great deal of evidence of Saunders's drug use." Saunders II, 249 So. 3d at 1168. The CCA specifically cited (1) trial counsel's opening statement, which included that Saunders smoked crack on the night he murdered Mr. Clemons; (2) Mrs. Clemons' testimony that Saunders smoked crack cocaine twice in her presence; (3) Foley Police Department Sgt. Tony Fuqua's testimony that Saunders informed him that Saunders had a crack cocaine problem; (4) Foley Police Department Lt. David White's testimony that police discovered an ashtray with a smoking pipe in it, along with a baggy containing crack near the Clemons' residence; and (5) Saunders'sown testimony that he purchased crack cocaine on the day he murdered Mr. Clemons.

Id. at 1167. The CCA identified five instances during the guilt phase when the jury heard of Saunders's crack use on the night of the murder. This led the CCA to conclude that "[t]he record clearly shows that Saunders's trial counsel did present a great deal of evidence of Saunders's drug use." Id. at 1168. Second, it held that

> To the extent that Saunders argues that counsel was ineffective for failing to present the testimony of an expert on the effects of alcohol and drug abuse, Saunders failed to adequately plead this aspect of this claim. Saunders failed to plead how this evidence should have been presented or what expert should have presented this evidence.

Id.[10]

In Alabama, a specific intent to kill is necessary in order to convict someone of capital murder. Shanklin v. State, 187 So. 3d 734, 795-96 (Ala. Crim. App. 2014). "To negate the specific intent required for a murder conviction, the degree of the accused's intoxication must amount to insanity." Davis v. State, 740 So. 2d 1115, 1121 (Ala. Crim. App. 1998). "The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill." Smith v. State, 646 So. 2d 704, 712-13 (Ala. Crim. App. 1994) (quoting Ex parte Bankhead, 585 So. 2d 112, 121 (Ala. 1991)).

Trial counsel repeatedly argued Saunders's crack cocaine use prevented him from forming specific intent. During closing argument, trial counsel argued that "the intoxication caused by him smoking crack cocaine negates the specific intent[,]" (Doc. 41-12 at 12), and that "the theory of the defense of Mr. Saunders has been, that he never formed the intent to do anything." (Id. at 15). Trial counsel further stated:

---

[10] The CCA also held that failing to call an expert witness is not per se ineffective. Saunders II, 249 So. 3d at 1168.

- "If you believe that the crack cocaine negated the intent, you can find him guilty of the manslaughter charge." (Id. at 18).

- "You hear about crack cocaine and the use and abuse and the effects that it has on people in our society. And I think everyone would agree that if Mr. Saunders never used crack cocaine or never smoked it, we probably wouldn't be here, we probably wouldn't be here." (Id. at 3).

- "From the very beginning we – as [the State prosecutor] Ms. Newcomb suggested, we're not questioning who did it. We've admitted his responsibility from the very beginning. From the very beginning of this we said, yes, Tim did that. *The question this comes down to is the question that revolves around intent.*" (Id. at 3-4) (emphasis added).

As it relates to trial counsel's mitigation defense, Saunders's Rule 32 petition included the following pleadings:

> 19. During the guilt phase of Mr. Saunders's trial, trial counsel did not call any witnesses who could have testified as to the effect of intoxication, including crack cocaine intoxication, upon a criminal defendant's ability to form the requisite intent necessary for the State to prove a charge of capital murder. Trial counsel called no witness to provide testimony about the interaction between drug and alcohol abuse and untreated mental illness on a criminal defendant's ability to form the requisite intent to commit a capital offense. Trial counsel called no witnesses to provide testimony about Mr. Saunders's inability, given his mental illness, addictions and intoxication, to provide a voluntary, knowing confession.

(Doc. 41-34 at 12, ¶ 19).

> 92. Mr. Saunders was prejudiced by ineffective assistance of counsel at the guilt and penalty phases at his capital trial. First, trial counsel's deficient performance was. Prejudicial during the guilt -phase of Mr. Saunders's trial as: . . . (d) trial counsel failed to present proof: through appropriate experts, that, due to Mr. Saunders's mental illness, addictions and substance abuse in the 24 hours preceding the crimes made the basis of his complaint, he could not have formed the requisite intent to commit the crimes. for which he was convicted . . . .

(Id. at 28, ¶ 92). He further pled that

> 93. Counsel's deficient performance was prejudicial at the guilt phase because counsel could have presented compelling evidence to support a lack of intent theory. There is a reasonable probability that but for trial counsel's ineffectiveness Mr. Saunders would not have been convicted of intentional murder.

(Id. at 28, ¶ 93).

This claim does not entitle Saunders to habeas relief. First, Saunders did not plead that an expert could have testified that his consumption of crack cocaine caused him to become so intoxicated that it amounted to insanity. See Davis, 740 So. 2d at 1121 ("To negate the specific intent required for a murder conviction, the degree of the accused's intoxication must amount to insanity."). The requirement to specifically plead the witness' name and the content of the expert witness' report comports with the analogue rule for federal habeas petitions. As one district court has noted,

> Federal habeas corpus petitioners asserting claims of ineffective assistance based on counsel's failure to call a witness (either a lay witness or an expert witness) satisfy the prejudice prong of Strickland only by naming the witness, demonstrating the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing the testimony would have been favorable to a particular defense.

Freeman v. Dunn, 2018 WL 3235794, at *71 (M.D. Ala. July 2, 2018) (emphasis omitted) (citing Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010); Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009)). Thus, even if Saunders demonstrated trial counsel's actions fell below the prevailing professional norms at the time, he has not shown the inaction resulted in any prejudice.

Dr. Brodsky, an expert who testified during the penalty phase, prepared a report submitted on August 15, 2005 that relayed that it is questionable whether Saunders was able to control his actions. But Dr. Brodsky's report did not claim (and Dr. Brodsky would not later testify) that Saunders's degree of insanity rendered it "impossible for [Saunders] to form the intent to kill." Smith v. State, 646 So. at 712-13 (quoting Ex parte Bankhead, 585 So. 2d at 121). Instead, during the subsequent sentencing phase, Dr. Brodsky would testify that

> [I]n a state of acute intoxication from alcohol and drugs, it put him in an altered state of consciousness, made worse by the psychosis, and in my mind -- now, this isn't a legal term, this is just my term. In my mind, that state being high on drugs and alcohol and being psychotic, gave him a diminished capacity to appreciate what it was that he was doing at the time of the offense.

(Doc. 41-19 at 145).

Second, Saunders's invites habeas review in order to "require the Alabama Court of Criminal Appeals to correct its misapprehension of its own prior decisions." (Doc. 41-1 at 46, ¶ 73). Specifically, he argues that the CCA's requirement that a post-conviction ineffective assistance claim for failing to secure an expert's services states both the expert's name and his or her expected testimony contravenes CCA precedent. This does not constitute grounds available to succeed on a habeas claim. This is because "state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters." Agan v. Vaughn, 119 F.3d 1538, 1549 (11th Cir. 1997). See also id. (citing Pulley v. Harris, 465 U.S. 37, 41 (1984)) ("A federal court may not issue the writ on the basis of a perceived error of state law."); Hays v. Alabama, 85 F.3d 1492, 1500 (11th Cir. 1996) cert. denied, 520 U.S. 1123 (1997) ("Petitioner is due no relief on the grounds that Alabama has misinterpreted its own law."). The Court accordingly concludes the CCA's determination of this claim was not contrary to nor an unreasonable application of clearly established federal law. The claim is **DENIED**.

> b. Mr. Saunders's trial counsel was ineffective during the guilt phase because even if trial counsel's decision to call Mr. Saunders to testify during the guilt phase was made for strategic reasons, trial counsel's execution of that decision was ineffective at best, and, at worst, tended to establish the inference that Mr. Saunders was guilty of capital murder.

Saunders testified during the guilt phase of his trial. (See generally Doc. 41-10 (Saunders's testimony)). Saunders contends trial counsel had no legitimate reason to call him as a witness during the guilt phase. (Doc. 41-1 at 46, ¶ 74). Saunders also claims the decision to call

him to testify was ineffectively implemented because Saunders's counsel failed to prepare him for his testimony. (Id. at 47, ¶ 74-75). Saunders broadly argues his questioning lacked any sound legal reasoning or strategy. (Id. at 49-50, ¶ 78). In support of this claim, Saunders faults trial counsel for (1) failing to question Saunders about his mental state; (2) failing to elicit testimony about Saunders's history of mental illness; and (3) effectively acting as a "surrogate prosecutor[.]" (Id. at 48, ¶ 76).

During Saunders's testimony, his trial counsel asked questions such as:

- "What did [Mr. Clemons] do to deserve [being murdered]?"  (Doc. 41-10 at 22).

- "Do you realize how hard you hit [Mr. Clemons]?" (Id. at 23).

- "Do you see how small [Mrs. Clemons] is?" (Id. at 27).

As a result, Saunders argues his counsel coached him to concede capital murder guilt, prejudiced the jury, violated his rights under the Due Process Clause to plead not guilty and to hold the government to strict proof beyond a reasonable doubt, resulting in "per se ineffective assistance of counsel . . . ." (Doc. 41-1 at 50, ¶ 79). Saunders's entire argument about the type of questions posed and the lack of strategic questions is as follows:

> Trial counsel failed to question Mr. Saunders about his mental state when he struck Mr. Clemons. He did not question Mr. Saunders about whether he intended to rob or burglarize the Clemonses at the time he struck Mr. Clemons. Trial counsel did not elicit any testimony from Mr. Saunders about his previous diagnoses of mental illness, whether his mental illness was being treated at the time of the incident, or Mr. Saunders's behavior when his mental illness was adequately treated. Had these questions been asked, the jury would have been presented with compelling evidence showing that Mr. Saunders did not have sufficient culpability to sustain a conviction for capital murder, even if the fact that Mr. Saunders killed Mr. Clemons was a foregone conclusion.

(Id. at 47, ¶ 75).

He argues the CCA discounted the evidence, which conflicted with the Supreme Court's holding in Porter v. McCollum, 558 U.S. 30 (2009). According to Saunders, this "mountain of

evidence[,]" (Doc. 41-1 at 51, ¶ 81), concerning his mental illness and substance abuse was ignored by the CCA. Saunders cites Porter for the proposition that "a court may not 'unreasonably discount' evidence relevant to 'assessing a defendant's moral culpability.'" (Doc. 41-1 at 51-52, ¶ 81 (quoting Porter, 558 U.S. at 41 (2009)).

The Respondent responds in three ways. First, the Respondent argues that Saunders only partially exhausted this claim. She argues that Saunders did not exhaust his claim regarding inadequate preparation, and that the claim is now procedurally defaulted. Second, the Respondent states partial concession of guilt is not automatically ineffective, but must remain analyzed under the Strickland standard. Third, under the required Strickland analysis, she argues that Saunders's concession was reasonable under Strickland because the decision emanated from an "attempt to gain credibility with the jury by conceding facts that could not be contested and then argue that those facts constituted a lesser crime than capital murder." (Doc. 47 at 44). As a result, the Respondent argues Saunders failed to plead how he was prejudiced. (Id.).

The CCA affirmed the circuit court's summary dismissal of this claim pursuant ALA. R. CRIM. P. 32.7(d). First, it did so based on Rule 32.6(b), faulting Saunders for failing to meet his burden of pleading the full facts in support of his claim. In doing so, it held "Saunders was required to plead how he was prejudiced by counsel's concession of guilt[.]" Saunders II, 249 So. 3d at 1165. The CCA noted that

> Saunders has mischaracterized counsel's actions at trial. Although counsel did concede that Saunders did commit the act that resulted in Mr. Clemons's death, counsel argued that Saunders could not form any specific intent to kill because he was under the influence of crack cocaine at the time of the killing. Counsel did not concede Saunders's entire guilt as Saunders argues in his brief to this Court. Moreover, even if counsel did concede Saunders's guilt, Saunders would be entitled to no relief on this claim.

Id. at 1163-64.

And second, the CCA affirmed based upon Rule 32.7(d), holding no material issue of fact or law would entitle him to relief. Turning to the prejudice prong, the CCA elaborated, noting

> "Immediately after he was arrested, Saunders confessed to killing Mr. Clemons by hitting him on the head with the crowbar he had borrowed earlier from Mr. Clemons, and he admitted that he had feigned an asthma attack to gain entry into the Clemonses' residence, where he attacked Mrs. Clemons and took money from Mr. Clemons's wallet and from Mrs. Clemons's purse. Faced with Saunders's confession, with Mrs. Clemons's identification of Saunders at trial and her testimony at trial, and with the other testimony and evidence establishing Saunders's participation in the crimes, defense counsel reasonably attempted to urge the jury to find Saunders guilty of lesser-included charges based on Saunders's inability to form the specific intent to commit capital murder."

Id. at 1165-66 (quoting Saunders I, 10 So. 3d at 92-93). "[G]iven the overwhelming evidence of Saunders's guilt, Saunders could have suffered no prejudice as a result of counsel's questioning." Id. at 1166.

### i. *Procedural Default*

The Respondent argues that Saunders's claim that trial counsel failed to adequately prepare him to testify is procedurally defaulted because Saunders "did not allege in that petition that counsel erred in preparing him . . . ." (Doc. 47 at 42-43). In paragraph 92 of Saunders's Rule 32 petition, he pled the following: "Mr. Saunders was prejudiced by ineffective assistance of counsel at the guilt and penalty phases at his capital trial. First, trial counsel's deficient performance was prejudicial during the guilt phase of Mr. Saunders's trial as: . . . (b) *trial counsel failed to prepare Mr. Saunders to testify*[.]" (Doc. 41-34 at 27, ¶ 92) (emphasis added). This was not couched in a specific claim, such as Saunders's contention that counsel's concession of guilt was prejudicial, but more so as a prelude for the claims he later would explicitly identify. The lack of factual foundation renders this allegation inadequately presented.

"[F]ederal courts require a petitioner to present his claims to the state court 'such that a reasonable reader would understand each claim's particular legal basis and specific factual

foundation.'" French v. Warden, Wilcox State Prison, 790 F.3d 1259, 1270-71 (11th Cir. 2015) (quoting Kelley, 377 F.3d at 1344-45). Saunders's Rule 32 petition failed to provide the state court with a specific factual foundation. In doing so, the claim, as it relates to trial counsel's alleged failure to prepare Saunders to testify, was not fairly presented to the state courts. Because Saunders did not properly present this element of the claim to the state courts, it is barred from federal habeas review.

      ii.   *Merits*

In upholding the circuit court's summary dismissal, the CCA held that trial counsel was not *per se* ineffective for conceding Saunders killed Mr. Clemons. The Supreme Court, in United States v. Cronic, 466 U.S. 648 (1984), outlined specific instances of ineffective assistance "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." Id. at 658. Under those specific instances, "[p]rejudice may be presumed[.]" Castillo v. Fla., Sec'y of DOC, 722 F.3d 1281, 1286 (11th Cir. 2013). Absent the existence of one of the three outlined exceptions, a petitioner must satisfy Strickland's two-part requirement and show both deficient performance and actual prejudice. As the Eleventh Circuit has explained, prejudice may be presumed "only where: (1) there is a 'complete denial of counsel' at a 'critical stage' of the trial, (2) 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing,' or (3) under the 'circumstances the likelihood that counsel could have performed as an effective adversary was so remote as to have made the trial inherently unfair.'" Id. at 1286-87 (emphasis omitted) (quoting Cronic, 466 U.S. at 659-61).

The CCA held trial counsel's concession of guilt did not invoke the presumed-prejudice standard. "Because the presumed-prejudice standard would not apply in Saunders's case," the CCA held, "Saunders was required to plead how he was prejudiced by counsel's concession of

guilt; however, Saunders failed to do so." <u>Saunders II</u>, 249 So. 3d at 1165. It further held that due to the overwhelming evidence of Saunders's guilt, Saunders would have suffered no prejudice as a result of trial counsel questioning. This, it said, meant there was no material issue of law or fact that would entitle Saunders to relief. <u>Id.</u> at 1166.

The CCA's holding that Saunders's failed to plead how he was prejudiced by trial counsel's concession that Saunders murdered Mr. Clemons was not unreasonable. The sum total of this claim, as pleaded in Saunders's original Rule 32 petition is as follows:

> 97. Inexplicably trial counsel placed Mr. Saunders on the stand and not only allowed him to admit killing the deceased victim but also, in effect, took on the role of prosecutor in questioning Mr. Saunders. Trial counsel's actions caused Mr. Saunders to provide the State with the functional equivalent of a guilty plea. Trial counsel's concession of guilt also likely impacted their performance at every stage of the trial.

> 98. "Trial counsel's concession of guilt violated not only Mr. Saunders right under the due process clause to plead not guilty, but also his right to 'hold the government to strict proof beyond a reasonable doubt' and 'have his guilt or innocence decided by the jury.' <u>Wiley v. Sowders</u>, 647 F.2d 642, 650 (6th Cir. 1981). <u>See</u> <u>also</u> <u>Francis v. Spraggins</u>, 720 F.2d 1190, 1194 (11th Cir. 1983). Such conduct is per se ineffective assistance of counsel and 'triggers a presumption of prejudice.' <u>United States v. Williamson</u>, 53 F.3d 1500, 1511 (10th Cir. 1995). Accord, <u>Brown v. Rice</u>, 693 F.Supp. 381, 396 (W.D.N.C. 1988) ('[counsel's concession of guilt is ineffective assistance] regardless of the weight of the evidence of defendant'), reversed on other grounds, <u>Brown v. Dixon</u>, 891 F.2d 490 (4th Cir. 1989); <u>State v. Harbison</u>, 315 N.C. 175, 337 S.E.2d 504, 507-08 (1985) ('[W]hen counsel ... admits his client's guilt, the harm is so likely and so apparent that ... prejudice need not be addressed.') Accordingly, Mr. Saunders conviction must be reversed. <u>United States v. Swanson</u>, 943 F.2d 1070, 1071 (9th Cir. 1991) (finding that counsel's concession of guilty is 'a deprivation of ... due process and the effective assistance of counsel')."

(Doc. 41-34 at 29-30, ¶¶ 97-98).

The CCA's conclusion that counsel's questioning, which included Saunders's admitting that he killed Mr. Clemons, did not prejudice Saunders due to the "overwhelming evidence" concerning Saunders's guilt is not unreasonable under <u>Strickland</u>. In <u>Fla. v. Nixon</u>, 543 U.S. 175

(2004), the Supreme Court held "[a] presumption of prejudice is not in order based solely on a defendant's failure to provide express consent to a tenable strategy counsel has adequately disclosed to and discussed with the defendant." Id. at 179. Absent this presumption, Strickland demands a petitioner demonstrate (or, in this case plead) that, but for the unprofessional error, a reasonable probability exists that the result of the proceeding would be different. Strickland, 466 U.S. at 694. Saunders's has failed to show that the CCA's holding was contrary to or an unreasonable application of clearly established federal law. Considering the plethora of evidence implicating Saunders, the Court concludes the CCA has not unreasonably applied, or reached a decision contrary to, clearly established federal law. As the Eleventh Circuit has held in a similar case,

> Under such circumstances, it would be very difficult to see how the outcome of the trial would have been different had [trial counsel] not conceded [the petitioner's] guilt, as charged in the indictment. See Nixon, 543 U.S. at 192, 125 S.Ct. at 563 ("[C]ounsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in 'a useless charade' [by failing to concede overwhelming guilt]." (quoting Cronic, 466 U.S. at 656 n. 19, 104 S.Ct. at 2046 n. 19)).

Harvey v. Warden, Union Corr. Inst., 629 F.3d 1228, 1252 (11th Cir. 2011). Saunders failed to demonstrate that the CCA's holding was contrary to or involved an unreasonable application of clearly established federal law. For these reasons, this claim is **DENIED**.

2. MR. SAUNDERS WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF HIS TRIAL.

Saunders argues trial counsel's ineffectiveness seeped over to the penalty phase. (Doc. 41-1 at 53). On August 31, 2005, the trial court began the penalty phase. That same day, the jury returned a "Sentencing Verdict" in which all twelve jurors voted for "death" and zero voted for "life without parole[,]" the two options listed. (Doc. 41-23 at 7-8; Doc. 41-24 at 2).

In Alabama, unless at least one "aggravating circumstance" exists, the sentence imposed is life without the possibility of parole. Ala. Code § 13A-5-45(f). The State bears the burden of proof as to the existence of any aggravating circumstances, but "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." Ala. Code § 13A-5-45(e).

Here, the trial court instructed the jury as to four types of aggravating circumstances, namely (1) the murder was committed while the defendant was engaged in a robbery or an attempt to commit robbery; (2) the murder was committed during the course of a burglary or an attempt to commit burglary; (3) the murder was committed while the defendant was under a sentence of imprisonment; (4) or that the murder was "especially heinous, atrocious, and cruel as compared to other capital offenses." (Doc. 41-22 at 10; Doc. 47 at 22-23). The trial court instructed the jury that if it did not find any aggravating circumstance proven beyond a reasonable doubt, it must set the punishment to life imprisonment without the possibility of parole. (Doc. 41-22 at 10). The trial court then continued to instruct the jury on types of mitigating circumstances it could consider. <u>See</u> Ala. Code § 13A-5-51 (listing mitigating circumstances).

Saunders's ineffective assistance of counsel claims pertain to both the jury recommendation portion and the sentence hearing portion. However, in order to analyze <u>Strickland</u>'s prejudice prong, courts must evaluate the prejudice in relation to a specific portion. <u>See</u> <u>Clark v. Dunn</u>, 2018 WL 264393, at *20 (S.D. Ala. Jan. 2, 2018) (Steele, J.) (citing <u>Brownlee v. Haley</u>, 306 F.3d 1043, 1075-80 (11th Cir. 2002) ("[B]ecause prejudice must be measured separately with respect to the jury recommendation and the trial judge's sentence, the

Court evaluates the claim separately as to these component parts[.]")). Saunders occasionally neglects to delineate which portion of the penalty phase he alleges trial counsel ineffectively performed.[11]

Saunders's penalty phase began on Wednesday, August 31, 2005. It lasted one day. The trial court accepted Dr. Stanley Brodsky as an expert in the field of clinical psychology. (Doc. 41-19 at 69). He had previously conducted a psychological evaluation on Saunders. (Id.). Dr. Brodsky testified that his evaluation of Saunders led him to conclude that Saunders suffered from "a major depressive disorder, recurrent, severe, with mood congruent psychotic feature." (Id. at 78). Dr. Brodsky also detailed his review of Saunders's records, which indicated that he attempted suicide in 1999, and he suffered auditory hallucinations, specifically command hallucination. (Id. at 78-79). Brodsky also diagnosed Saunders with polysubstance dependency. (Id. at 81; Doc. 41-48 (Brodsky Report) at 95).

After Dr. Brodsky concluded his testimony, Saunders's trial counsel called Joanne Terrell to the stand. The Court accepted her as an expert in the field social work. (Doc. 41-19 at 124). She testified as to Saunders's background generally and also addressed a number of mitigating factors. (Id. at 143). She explained that one such factor was that he was born into and raised in an abusive environment. (Id.). Saunders "lived in an extremely impoverished and gypsy-like environment[,]" Ms. Terrell explained. (Id.). According to Ms. Terrell, Saunders was malnourished, he internalized the violence he witnessed, and he became unable to cope. (Id. at 144). Ms. Terrell explained that Saunders learned from his father and stepfather to deal with his

---

[11] For instance, the first claim Saunders alleges under his penalty phase ineffective assistance claim involves two letters trial counsel received. These letters apparently were not introduced, either during the jury recommendation component or during the sentencing hearing. Saunders claims the failure to follow up, offer either letter, or call the letters' authors to testify constitutes ineffective assistance of counsel. He does not, however, identify whether this ineffectiveness fell under the (i) jury recommendation component, (ii) the sentencing hearing component (where trial counsel falsely claimed he had received no letters), or (iii) both.

feelings of angst and anxiety by ingesting or consuming drugs and alcohol, resulting in "a significant dependence . . . ." (Id.). Ms. Terrell explained to the jury that Saunders experienced command hallucinations. Finally, Ms. Terrell explained that Saunders experienced "a state of acute intoxication" when ingesting drugs and alcohol that "gave him a diminished capacity to appreciate what it was that he was doing at the time of the offense." (Id. at 145).

"The Sixth Amendment guarantees a criminal defendant the right of effective assistance of counsel during a capital sentencing hearing." Harris v. Dugger, 874 F.2d 756, 762 (11th Cir. 1989). The two-part Strickland test applies equally to a capital sentencing proceeding. Hardwick v. Crosby, 320 F.3d 1127, 1162 (11th Cir. 2003). Thus, Saunders must show *both* that (i) trial counsel's penalty phase performance was deficient *and* (ii) he was prejudiced as a result. Strickland, 466 U.S. at 687. When challenging a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting Strickland, 466 U.S. at 695).

> a. Mr. Saunders's trial counsel provided ineffective assistance at the penalty phase of the trial by failing to follow up with two individuals who wrote letters on Mr. Saunders's behalf, and to introduce those letters into evidence.

Saunders claims that his trial counsel failed to offer available mitigation evidence during the penalty phase.[12] (Doc. 41-1 at 66, ¶ 108). Specifically, he cites two letters, one from Kelly Newlan, Saunders's former girlfriend, and one from Alfreda Hyde, a family friend. At the sentencing hearing held on November 21, 2005, after the jury returned a recommendation that Saunders be sentenced to death, Judge Robert Wilters, the trial court judge, asked Saunders's trial counsel if he had any letters to present. (Doc. 41-25 at 4). Mr. Dasinger responded that he

---

[12] The Court understands this claim is directed towards the sentencing hearing before the trial court, and not the jury recommendation phase.

did not. (Id.). Yet Saunders claims two unsolicited letters were in fact sent to trial counsel on Saunders's behalf. (Doc. 41-14 at 66).[13] Newlan's letter expressed sadness over Mr. Clemons' death, and it also stated that Saunders was a victim for most of his life. (Doc. 41-34 at 44, ¶ 133). She wrote that the "real Timothy never would have hurt [Mrs. Clemons] or her husband . . . ." (Id.). Hyde wrote about Saunders's mother. (Id. at 44, ¶ 134). She wrote of the trauma Saunders's mother inflicted upon her children, the malnourishment they suffered as a result of her parental neglect, and how the children's basic needs went unmet. (Id.). She asked the trial court to have mercy on Saunders. (Id. at 45, ¶ 134).

The CCA deemed these letters cumulative in nature. The CCA noted that others, including Saunders's older sister, Dr. Brodsky, and Ms. Terrell "testified concerning Saunders's abusive and neglectful childhood." Saunders II, 249 So. 3d at 1171. It concluded no material issue of fact or law would entitle Saunders to relief and affirmed the circuit court, which had summarily dismissed his petition. (Doc. 41-41 at 38). The CCA held the "laundry list of evidence [Saunders] says counsel failed to present at sentencing[,]" Saunders II, 249 So. 3d at 1170, closely resembled evidence already presented during the sentencing hearing. The CCA noted the failure to "present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation." Id. at 1171 (quoting Daniel v. State, 86 So. 3d 405, 429-30 (Ala. Crim. App. 2011)) (in turn quoting Nields v. Bradshaw, 482 F.3d 442, 454 (6th Cir. 2007)).

The CCA's holding that these letters were "similar to evidence that had been presented at Saunders's sentencing[,]" Saunders II, 249 So. 3d at 1170, is not an unreasonable determination. Here, Saunders's sister and Ms. Terrell both testified to the horrid lifestyle in

---

[13] Saunders cites his Rule 32 Petition to the Baldwin County Circuit Court for the text of these letters. (See Doc. 41-34).

which Saunders was raised. The letters Ms. Newlan and Ms. Hyde sent certainly bolstered their testimony, but it did not add anything entirely new. Saunders's sister, Marie Young, testified about the frequent moves, (Doc. 41-19 at 9), the lack of proper sanitation, (Id. at 9-10), the amount of domestic violence the children witnessed (Id. at 13-15), her parents' alcoholism, (Id. at 14-15), and Saunders's rotten baby teeth (Id. at 26-27).

Further, Saunders has not pled that trial counsel's failure to introduce these letters resulted in prejudice. Said differently, Saunders has not pled that, absent his counsel's error, a reasonable probability exists that the trial judge would have concluded "the balance of aggravating and mitigating circumstances did not warrant death." Stewart, 476 F.3d at 1209 (quoting Strickland, 466 U.S. at 695). As the Eleventh Circuit recently held, "In assessing prejudice, '[courts] consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation.'" Puiatti v. Sec'y, Fla. Dep't of Corr., 732 F.3d 1255, 1286 (11th Cir. 2013) (quoting Porter, 558 U.S. at 41).

The trial court, in its "Findings Concerning the Existence or Non-Existence of Mitigating Circumstances" included Ms. Young's testimony "of their childhood and the difficulties they had." (Doc. 41-27 at 9). The trial court further alluded to the "contentious [lifestyle,] with alcoholism and violence being the norm." (Id. at 10). Notwithstanding these mitigating factors, the trial court held that "[t]he aggravating circumstances *far outweigh* all the mitigat[ing factors] that can be compiled in favor of . . . Saunders." (Id. at 10) (emphasis added). For the foregoing reasons, this claim is **DENIED**.

> b. Mr. Saunders's trial counsel provided ineffective assistance at the penalty phase of the trial by failing to follow up with Mrs. Clemons, who would have testified that she did not want Mr. Saunders to receive the death penalty.

Saunders next claims that his trial counsel rendered ineffective assistance at the penalty phase when he failed to contact Mrs. Clemons.[14] According to Saunders's sister, Marie Young, Mrs. Clemons told her something to the effect of she did not wish to see Saunders sentenced to death. (Doc. 41-1 at 68) (citing Doc. 41-34 at 41). Saunders alleges trial counsel's failure to investigate potential mitigation evidence prejudiced Saunders and had he done so, a reasonable probability exists he would not have been sentenced to death. (Id. at 69, ¶ 112).

The Respondent responds by noting the CCA deemed this evidence cumulative and properly dismissed it. The Respondent further argues that the only evidence from which Saunders knows Mrs. Clemons' opinion is secondhand: from his sister, Ms. Young. (See Doc. 47 at 55 ("There was no affidavit from Agnes or other documentation attached to the Rule 32 petition supporting Young's assertion.")). The third argument the Respondent makes on this point is that testimony from victims regarding a defendant's appropriate sentence is usually inadmissible at a capital trial. (Doc. 47 at 55 (citing Stallworth v. State, 868 So. 2d 1128, 1175-76 (Ala. Crim. App. 2001)).[15]

Saunders has failed to show that the CCA's holding was unreasonable. "To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Grayson v. Thompson, 257 F.3d

---

[14] It appears that Saunders faults trial counsel on this claim at the penalty phase presentation to the jury and before the trial judge. In Saunders' Rule 32 petition, he pleaded the following: "At no time did trial counsel investigate Mrs. Clemons' wishes much less provide the court with proof of those wishes. Had trial counsel provided the *court or trier of fact* with this evidence, there is a reasonable probability that Mr. Saunders would not have been sentenced to death." (Doc. 41-34 at 41, ¶ 124) (emphasis added). However, Saunders pleaded in his Rule 32 petition that it was only after the jury's verdict that Mrs. Clemons informed Ms. Young of Mrs. Clemons' opinion.

[15] The CCA has routinely held that victim's family members' opinions about the appropriate sentence during the sentencing phase of trial should be prohibited. See Whitehead v. State, 777 So. 2d 781, 846 (Ala. Crim. App. 1999), aff'd sub nom. Ex parte Whitehead, 777 So. 2d 854 (Ala. 2000); Arthur v. State, 711 So. 2d 1031, 1093 (Ala. Cr. App. 1996). Those state cases – eschewing victim impact statements that advise or suggest an appropriate sentence – oftentimes involve opinions favoring the death penalty. Here, Mrs. Clemons, according to Ms. Young, disfavored a death sentence.

1194, 1216 (11th Cir. 2001) (quoting <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (in turn quoting <u>Burger v. Kemp</u>, 483 U.S. 776 (1987)). Moreover, "an attorney's performance is to be evaluated from his perspective at the time, rather than through the prism of hindsight." <u>Grayson</u>, 257 F.3d at 1216 (citing <u>Strickland</u> 433 U.S. at 689). There is no indication Saunders's trial counsel was aware of Mrs. Clemons' position prior to the penalty phase or sentencing hearing. Saunders cannot show that his trial counsel's failure to contact Mrs. Clemons fell below an objective standard of reasonableness.

Opinion regarding the appropriate sentence, even when favorable to the defendant, violates the Eight Amendment. <u>See</u> <u>United States v. Brown</u>, 441 F.3d 1330, 1351 (11th Cir. 2006) ("Thus, the <u>Booth</u> [<u>v. Maryland</u>, 482 U.S. 496 (1987),] prohibition against evidence of family members' opinions and characterizations of the crime, the defendant, and the appropriate sentence remains good law."). The CCA's determination of this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of facts. This claim does not entitle Saunders to habeas relief, and it is therefore **DENIED**.[16]

> c. Mr. Saunders's trial counsel provided ineffective assistance at the penalty phase of the trial by failing to investigate and develop evidence of the extreme abuse Mr. Saunders experienced during his childhood, and his own mental illness and drug abuse.

The third penalty phase ineffective assistance of counsel argument Saunders advances is related to trial counsel's failure to investigate and develop evidence of the extreme abuse he experienced as a child and his mental illness and drug abuse.[17] Saunders claims the CCA discounted the "mountain of evidence[,]" (Doc. 41-1 at 69, ¶ 113), related to his "moral

---

[16] Because the Court concludes this claim fails to prevail on the performance prong, the prejudice prong need not be analyzed. <u>See</u> <u>Borden</u>, 646 F.3d at 818 (quoting <u>Strickland</u>, 466 U.S. at 697) ("[T]here is no reason for a court deciding an ineffective assistance of counsel claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one.").

[17] Saunders claims appear to overlap. This claim centers upon Saunders' claim that trial counsel failed to *investigate and develop* Saunders' childhood abuse and mental illness. The next claim addresses Saunders claim that trial counsel failed to *present* evidence of extreme abuse.

culpability." (Id. at 70, ¶ 114) (quoting Porter, 558 U.S. at 41). As a result, Saunders argues that the CCA's unreasonable discounting of the evidence conflicts with Supreme Court precedent.

The Respondent argues the CCA correctly deemed the evidence cumulative in nature and therefore properly dismissed Saunders's claim. It first argues Saunders insufficiently pleaded his claim. Second, it credits the CCA's determination that the information was offered at trial, but more specifically presented in his Rule 32 petition.[18] The Respondent cites Ms. Terrell's report, which was introduced into evidence. The report included much of Saunders's life experiences. These experiences included: Saunders attempted suicide on at least three occasions (Doc. 41-47 at 31); growing up, Saunders frequently lacked enough food (id. at 32); Saunders had rotten teeth as a baby (id.); and many other the sordid biographical facts.

The CCA affirmed the circuit court's dismissal, holding that the claim did not present a material issue of fact or law that would entitle Saunders to relief. Saunders II, 249 So. 3d at 1172. With respect to additional evidence about Saunders's childhood abuse, the CCA determined that the additional evidence of abuse he claims went unpresented was cumulative. As the CCA held, "The record clearly shows that Saunders's older sister, Marie Saunders Young, and Joanne Terrell, a clinical social worker, and Dr. Stanley Brodsky, a psychologist, testified concerning Saunders's abusive and neglectful childhood." Id. at 1171.

With respect to Saunders's claim that trial counsel performed ineffectively by failing to investigate and develop evidence of his mental illness, the CCA held Saunders did not plead the "full facts" with regard to Dr. Brodsky's and Ms. Terrell's testimony because it "merely recites a synopsis of the reports prepared by each of the two experts but failed to plead what questions

---

[18] The Respondent notes that the State actually admitted into evidence a report prepared by Ms. Terrell's assistant, Tracy Wallace.

counsel should have asked, or what counsel should have done, to elicit the testimony he maintained should have been presented." Id.

And it also held that

. . . at the sentencing hearing trial counsel did present the testimony of a clinical psychologist, Dr. Stanley Brodsky. Dr. Brodsky testified that after evaluating Saunders he determined that Saunders suffered from a major depressive disorder, that he had experienced auditory hallucinations, that he had a history of alcohol and drug abuse, that he was suffering from polysubstance dependency, and that he had a diminished capacity to control himself at the time of the murder based on his psychological disorder and his ingestion of drugs.

Evidence of Saunders's mental health was offered at the penalty phase of his trial. Also, three witnesses testified at Saunders's penalty phase concerning his long history of substance abuse. Moreover, the circuit court found that Saunders's drug use at the time of the murder was a mitigating circumstance.

Id. at 1172. The CCA therefore concluded that the circuit court properly dismissed the claim, citing ALA. R. CRIM. P. 32.7(d).

"It is well established that counsel has 'a duty to make reasonable investigations' of potential mitigating evidence or 'to make a reasonable decision that makes particular investigations unnecessary.'" Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1356 (11th Cir. 2009) (quoting Wiggins, 539 U.S. at 521). "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Id. at 527.

As to the CCA's determination that the evidence of childhood abuse was cumulative, "the United States Supreme Court, this Court, and other circuit courts of appeals generally hold that evidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury."

Holsey v. Warden, Georgia Diagnostic Prison, 694 F.3d 1230, 1260-61 (11th Cir. 2012). In this case, as the Respondent notes, the jurors heard evidence from Ms. Young and Ms. Terrell (including both her testimony and her report) about the abuse Saunders suffered as a young child. And although some evidence might not have been presented, the evidence Saunders complains was not presented is simply "more or better examples" and "tells a more detailed version[.]" Id. at 1260.

Testimony during the penalty phase included testimony from two experts, Dr. Brodsky and Ms. Terrell. Unlike trial counsel in Johnson, 643 F.3d 907, a case Saunders cites in support, where the trial counsel "did nothing to pursue [information about the defendant's bad childhood] before the trial began[,]" id. at 932, here trial counsel retained the services of a social worker and a psychologist before trial commenced. Both testified. Both prepared reports prior to the beginning of trial. And both discussed Saunders's abusive and neglectful upbringing and present mental health. As to the failure to investigate, Saunders has failed to demonstrate how the CCA's decision that trial counsel's investigation and development of evidence related to Saunders's childhood abuse, substance abuse, and mental illness did not fall below the prevailing norms is contrary to or involved an unreasonable application of established Supreme Court precedent. As a result, this claim is **DENIED**.

> d. Mr. Saunders's trial counsel provided ineffective assistance at the penalty phase of the trial by failing to investigate and present to the jury evidence of the extreme abuse that Mr. Saunders experienced as a child.

Saunders devotes a substantial number of pages in his amended petition to this claim. Saunders argues trial counsel denied him effective assistance at the penalty phase by failing to investigate and present to the jury evidence of the abuse he experienced as a child. Saunders claims that "trial counsel failed to fully develop the facts of the severe and pervasive abuse Mr.

Saunders endured and witnessed throughout his childhood." (Doc. 41-1 at 71, ¶ 116). While Saunders acknowledges his trial counsel did present some evidence of his life experience in an effort to advance mitigation evidence, Saunders claims that he would not be sentenced to death had counsel presented a compelling "full panoply" of mitigation evidence. (Id. at 72, ¶ 117). Saunders argues counsel's presentation was "shallow" and that trial counsel could have provided a "far more thorough and graphic presentation" of the abuse. (Id. at 72, ¶ 117).

Saunders, at base, argues trial counsel should have presented the jury with a "completer presentation" of Saunders's history of abuse and neglect. (See id. at 73, ¶ 119 ("individual instances of abuse are not interchangeable")). Saunders also argues that when trial counsel did present evidence of Saunders's squalid living conditions, he did so inadequately. For instance, Saunders points to trial counsel's failure to have Ms. Young's photographs, showing Saunders's rotten teeth and squalid condition. (He had left them at his office.) (Id. at 74, ¶ 121). He points out that although Ms. Terrell testified and her assistant's notes were introduced into evidence, trial counsel failed to adequately prepare Ms. Terrell for direct examination and failed to do anything with the report beyond submission in documentary form to the jury. (Id. at 75, ¶¶ 122, 123). The full rendition of the abuse that he and his siblings suffered as children that Saunders alleges should have been presented was included in his Rule 32 petition.

> 152. Mr. Saunders's mother would put four ounces of sugar, two ounces of coffee, and two ounces of milk into the children's baby bottles when she stopped breast feeding. She bottle-fed them until they were five years old, and all of their baby teeth, including Mr. Saunders', rotted out as they grew in.
> 153. Several times a week, their mother would give the children Nyquil to put them to sleep at night.
> 154. As a baby and a young child, Mr. Saunders was subjected to physical abuse by both his mother and his father. Mr. Saunders's nickname was T-Bone. When he was teething, his paternal grandparents gave the family t-bone steaks, which was an unusual treat because the family often did not have enough food. After all the meat was off the bone, Mr. Saunders was teething on the t-bone. His mother hit him in the back of the head so hard that he fell forward, hit his head on the

glass table, and broke the glass with the impact. The glass was so thick that his older siblings, who were 14, 12, and 8 years older than he was, had been able to stand and play on the glass table.

155. When Mr. Saunders was no more than five years old, he brought home a puppy that had fleas. His father smacked him across the face. He went sailing into the door jam, cut his ear, and began to bleed.

156. This sort of abuse was chronic and inflicted upon all the children in the Mr. Saunders family. Mr. Saunders's father hit his brother Larry over the head with a beer bottle, leaving a three-inch gash. Instead of taking Mr. Saunders to the hospital, their mother glued the wound together with Superglue.

157. Mr. Saunders's father threw an ashtray so hard at Mr. Saunders's sister that, when it missed hitting her head, it stuck in the wall.

158. When Mr. Saunders was a young child, his older brother Larry was cooking and holding Mr. Saunders's younger brother L.B., who was a baby at the time. Their father came home drunk and said that Larry was going to cook L.B. Larry and their father got into a physical fight in which they smashed through a glass door and broke the kitchen table and chairs. Mr. Saunders's father has a scar on his head from that fight. Mr. Saunders's mother and the neighbors living on both sides called the police, but neither were arrested.

159. Mr. Saunders's mother would make his sister and Larry stand still while she threw iron horseshoes at their ankles. If they moved, she would throw them at their knees.

160. When Ms. Young was about five years old, she was coming back to the house from swimming and could not make it to the bathroom in time, so she wet her pants. As punishment, her mother hit her in the back of the leg with a wooden board that still had a nail in it. She has a scar on her leg where the nail hit.

161. When Mr. Saunders's brother Danny was little, Mrs. Saunders gave him aspirin. He woke up in the middle of the night and could not see because his eyes had swollen shut. Mrs. Saunders woke up Ms. Young and Larry. She beat them both for several hours, demanding to know what they had done to Danny and saying she would get it out of them one way or another. She eventually took Danny to the hospital, where she learned that Danny had had an allergic reaction to the aspirin and the other children had done nothing to cause the swelling.

162. Their father would hit all of the Mr. Saunders children with belts and his hand.

163. Their mother would hit the children with belts, broom handles, sticks, switches, wooden spoons, wire hangers, shoes, or anything else she could find. Mrs. Saunders would make the children strip naked and hit them from the soles of their feet to the hairline. She often hit them in the head with a broom handle or a tobacco stick, leaving a large lump.

164. The children would have to take off all their clothes, bend over, and hold their ankles. Their mother would then hit them on their buttocks with a belt, and if they let go of their ankles they would get two or three extra hits.

165. Both parents would make the children strip naked and bend over their knees for a spanking.

166. Mrs. Saunders would make the children go outside and cut their own switches from the tree. If one child cut a bigger switch than the other, the one that cut the smaller switch would be beaten with the bitter switch. If the switches were not big enough, Mrs. Saunders would go out and cut a large one. Mrs. Saunders would leave a few leaves on the end of the switch so that it would hurt more when she hit them. The children had welts and sometimes bled where the switches wrapped around their legs.

167. The beatings were not always punishments for something the children actually had done. The children were, in words of both parents, punished in case the children did something wrong "in the future."

168. The Mr. Saunders children would have to wear longsleeved [sic] shirts and long pants so that people could not see the bruises from their father's belt or the welts from their mother's lashings with the switches.

169. When the children were loud in the car, Mrs. Saunders would pinch the children so hard on their legs and other parts of their body that they would bleed. Ms. Young has a scar on her stomach from where her mother pinched her.

170. Particularly when Mrs. Saunders was drunk, she became angry that the children walked too loudly in the house. She would tape rocks to the bottom of Mr. Saunders's and his sibling's feet to keep them from walking loudly. The rocks stayed on Larry's feet so long that the skin started to grow around them, and he had to dig them out with a knife.

171. Beginning when Mr. Saunders was very young, his mother would make the children stand in the corner and hold a penny against the wall with their nose for three hours at a time, the amount of time it took her to watch three soap operas. If Mr. Saunders or another child fell asleep, which often happened, their mother would wake him by hitting him with a belt and then insist that he finish his punishment.

172. When Mr. Saunders was little, his mother left the children in the car while she went into a store to buy beer. One of the children shifted the gear shift in the car and it began to roll backwards. Mr. Saunders tumbled out of his open door, the car door hit him in the head as the car rolled, and he went somersaulting backwards. Mr. Saunders's mother ran out of the store and only said, "Oh, s--t. I forgot to pay for my beer."

173. Domestic violence was a constant in Mr. Saunders's life. From birth until his parents divorced when he was five or six years old, Mr. Saunders witnessed pervasive violence between his parents. Mr. Saunders's father lent money to a business partner at a time when Mr. Saunders's mother wanted to buy a pool. When his mother heard the money was gone, his mother punched his father in the face, knocking out his front teeth. His father fell to the ground and got a large gash on his back. Mr. Saunders's father's business partner stopped working with him as a result of the fight, and his father was out of work for a period. Consequently, the family lost their home.

174. Shortly before the divorce, Mr. Saunders's father threw his mother knees first through a glass table, resulting in wounds that left scars, while the children watched.

175. Immediately before the divorce, when the family was living in North Myrtle Beach, Mr. Saunders's mother tried to cut his father's penis off with a steak knife. She managed to cut him, and the children watched as he ran out of the bedroom naked, leaving a trail of blood through the trailer and out onto the beach.

176. Mrs. Saunders would often sleep in the bedroom with a chair forced under the door handle, and Mr. Saunders's father would sleep in the living room, tying the bedroom door handle to another door so that she could not get out.

177. People often called the police on the Mr. Saunders family, but the parents would kiss and make up when the police arrived.

178. Mr. Saunders was also exposed to alcoholism as a baby and a young child. When Mr. Saunders was young, his mother drank a 12-pack of beer a day. Mrs. Saunders was drunk nearly every night of her 21-year marriage to Mr. Saunders's father.

(Doc. 41-34 at 49-53).

The circuit court held that "Petitioner's complaint of failure on the part of his counsel to present certain testimony or evidence is without merit, as it would have merely been repetitive. Everything complained of was presented to the Jury in the guilt phase and penalty phase of the trial." (Doc. 41-37 at 2). The CCA held trial counsel's failure to present the instances described above did not reach a constitutional violation. The CCA quoted Saunders I in addressing the "plethora of evidence" it held Saunders's counsel presented by way of mitigation during the penalty phase. This evidence, the CCA held, "shows that Saunders's older sister, Marie Saunders Young, and Joanne Terrell, a clinical social worker, and Dr. Stanley Brodsky, a psychologist, testified concerning Saunders's abusive and neglectful childhood." Saunders II, 249 So. 3d 1153, 1171.

Saunders contends this list is not cumulative, and that viewed as a whole, raises a reasonable probability that the sentencing proceedings would have resulted in a different outcome. The crux of the problem here is not that trial counsel failed to present any evidence. Trial counsel plainly did so. Instead, Saunders takes issue with the thoroughness, completeness, and adequacy of that work.

As is apparent, some facts listed above do not pertain to Timothy Saunders. For example, paragraphs 159, 160, and 161 concern abuse and neglect happened upon Saunders's sister, Marie, and his brothers. The facts make no reference as to whether Timothy Saunders witnessed the instances of abuse. As a result, the Court fails to see how this would be relevant to Saunders's mitigation evidence. See Brownlee, 306 F.3d at 1074 (quoting Cunningham v. Zant, 928 F.2d 1006, 1019 (11th Cir. 1991)) (primary purpose of penalty phase is to make certain a defendant's sentence is individualized by airing "the particularized characteristics of the defendant"). However, a majority of the instances do, in fact, involve Timothy Saunders.

Saunders contends by "unreasonably discount[ing] this evidence[,]" (Doc. 41-1 at 81, ¶ 126), the CCA's decision was contrary to prior United States Supreme Court precedent. Paragraph 119 of Saunders's amended habeas petition succinctly summarizes his argument:

> The Court of Criminal Appeals misapprehended that individual instances of abuse are not interchangeable and that a complete presentation of the full extent of Mr. Saunders's childhood abuse was necessary for the jury to fully appreciate the degree of Mr. Saunders's culpability for Mr. Clemons's death. The Appeals Court failed to recognize that trial counsel's presentation of that evidence during the penalty phase was nothing more than a "hollow shell," rendering counsel's performance unconstitutionally deficient. See Johnson v. Secretary, DOC, 643 F.3d 907 (11th Cir. 2011) (despite that defense counsel had called witnesses, including family members and a psychologist, during the penalty phase of a capital trial, defendant was not provided with effective assistance of counsel in contravention of the Sixth and Fourteenth Amendments as counsel had failed to reasonably investigate and present other available mitigating evidence).

(Id. at 73, ¶ 119).

"The Supreme Court has instructed us that a troubled history that includes severe privation, abuse, physical torment, and an alcoholic, absentee mother, is the kind of troubled history that the Court has declared relevant to assessing a defendant's moral culpability." Johnson, 643 F.3d at 936 (internal quotation marks omitted) (quoting Wiggins, 539 U.S. at 535). Indeed, in Wiggins, the Supreme Court concluded that

The mitigating evidence counsel failed to discover and present in this case is powerful. As [the licensed social worker] reported based on his [postconviction] conversations with Wiggins and members of his family, . . . Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case. Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.

Wiggins, 539 U.S. at 534-35.

Even so, the "United States Supreme Court, [the Eleventh Circuit], and other circuit courts of appeals generally hold that evidence presented in postconviction proceedings is "cumulative" or "largely cumulative" to or "duplicative" of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury." Holsey, 694 F.3d at 1260-61. "It is well-settled in this Circuit that a petitioner cannot establish an ineffective assistance claim simply by pointing to additional evidence that could have been presented." Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1324 (11th Cir. 2002). Moreover "[a] petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative." Id. at 1324 n.7

Unlike in Porter, where "the judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability[,]" Porter, 558 U.S. at 41, here the jury heard from multiple people regarding Saunders's history. Saunders's sister, Marie Young, also testified regarding Saunders's nightmarish childhood. She testified about the frequent moves, (Doc. 41-19 at 9), lack of proper sanitation, (Id. at 9-10), the amount of domestic violence the children witnessed (Id. at 13-15), her parents' alcoholism, (Id. at 14-15), and Saunders's rotten baby teeth, (Id. at 26-27). Trial counsel also solicited from Saunders's sister testimony of the neglect the children suffered during their childhood.

Based on this record, the CCA's determination that the evidence Saunders now identifies was cumulative was not unreasonable. First, Timothy Saunders's sister, Marie, testified during the sentencing phase before the jury. She testified about Saunders's rotten baby teeth, her parent's alcoholism, witnessing her father throw her mother knee-first into a glass coffee table, her mother's affinity for pinching her brothers' penises, and other horrible examples of abuse. Second, Ms. Terrell testified about facts Ms. Young did not discuss. For instance, she testified that Saunders's mom taped rocks to her children's feet to force the kids to walk quietly. (Id. at 133). She testified that, for punishment for using the restroom in the yard, Saunders's mother forced the children, including Saunders, to stay outside without any clothes until their paternal grandparents drove by and noticed them. (Id.). She testified that Saunders drank his first beer at age 7. (Id. at 134). When asked what impact "the abuse and the alcohol, moving around have on Tim?[,]" Ms. Terrell responded:

> Well, from an attachment theory standpoint, his ability, as I said, to form close, trusting relationships with people was severely damaged. From a social learning standpoint, by the time he was 10, he grew up in a household of people yelling, hitting, drinking, getting drunk, partying, and that sort of thing. And social learning theory tells us that children learn what is modeled to them frequently. And if they witness violence as a way to handle your anger, then they learn to be violent. If they witness drinking as a way to calm yourself down, then they learn that that's how they calm themselves down is by drinking. He had no other peers.

(Id. at 135).

What is clear from Ms. Terrell's and Ms. Young's testimony is that the jury was well informed about the traumatic experiences Saunders had during his upbringing. The evidence Saunders now complains was not introduced amplified the testimony Ms. Young and Ms. Terrell provided. Accordingly, Saunders's claim that his trial counsel failed to adequately present Saunders's history of extreme abuse does not merit habeas relief and is **DENIED**.

e. Mr. Saunders's trial counsel provided ineffective assistance at the penalty phase of the trial by failing to investigate and present to the jury evidence of Mr. Saunders's family's history of mental illness and substance abuse.

Saunders next claims his trial counsel performed ineffectively by failing to investigate and present evidence of his family's history of mental illness to the jury. (Doc. 41-1 at 82, ¶ 127). Specifically, Saunders claims "trial counsel failed to present evidence regarding the history of severe mental illness and substance abuse that ran in Mr. Saunders's family." (Id. at 82, ¶ 128). This failure, Saunders argues, amounted to constitutionally deficient assistance of counsel.

In addition to the mitigating circumstances enumerated in § 13A-5-51, § 13A-5-52 provides that "mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death." Ala. Code § 13A-5-52. Saunders claims his family history is relevant to the potential mitigating evidence he could present. (Doc. 41-1 at 81-82, ¶ 127). To be clear, this information was not Saunders's personal history of mental illness and substance abuse, but instead involved (1) Saunders's maternal grandmother's history of mental illness; (2) his brothers' history of mental illness; (3) his siblings' previous suicide attempts; and (4) various other addictions his family members faced. He argues that the CCA's decision runs contrary to United States Supreme Court's precedent and the CCA's own precedent.

Within Saunders's Rule 32 petition, he pled the following:

138. . . . Mr. Saunders's maternal grandmother, Annie Mae Bush, was convinced that she lived in the television. She would talk to the characters in the soap operas she watched, and would not interact with her children. Ms. Bush would leave the house only twice a month, once to pay the light bill, and once more to get commodities. Mr. Saunders's sister, Marie Young, once invited their grandmother to a barbecue. Ms. Bush said that she could not go because her daughter was

living with a man to whom she was not married, and Ms. Bush was afraid that the police would arrest her for prostitution if she went to the barbecue. Towards the end of her life, Ms. Bush was hospitalized and treated for her mental illness in Pensacola, Florida. She was diagnosed with manic depression and schizophrenia.

139. Two of Mr. Saunders's brothers, Danny and Matthew, have been diagnosed with both schizophrenia and bipolar disorder. When Mr. Saunders's brother Danny was in his 20's, he believed for several years that he was a vampire. He had long hair, would only go out at night so he was pale, would always wear a cape, and wore caps on his teeth to look like fangs. Danny also thought he was a warlock, carved a wooden sword, and believed that he had magical powers. Danny believed he heard voices, demons, and Satan talking to him.

140. Mr. Saunders's sister and mother both suffer from depression. Ms. Young takes Xanax and Cymbalta to manage her depression. Mrs. Saunders takes Lexapro to treat depression, and Xanax for anxiety.

141. Mr. Saunders's mother has attempted suicide on multiple occasions. When the family was living in Pensacola, Florida in the late 1980's, Mrs. Saunders tried to drown herself in a pond and told Mr. Saunders's sister that she wanted to go to heaven to be with Regina, her daughter who died shortly after her birth. Mrs. Saunders tried to cut herself, overdose on pills, and crash her car into a building.

142. Three of Mr. Saunders's siblings have attempted suicide as well. Ms. Young tried to kill herself by overdosing on pills in the late 1980's. A friend found her and stopped her. Mr. Saunders's brother Danny tried to commit suicide by stabbing himself. Ms. Young found him and stopped him. He also tried to kill himself with a gun and to overdose on drugs. As teenagers, Ms. Young and Mr. Saunders's eldest brother Larry would often talk about wanting to commit suicide. Larry had a plan to kill himself with razor blades or a knife, but Ms. Young talked him out of killing himself because she said she needed his help to raise their younger brothers. Later, in both South Carolina and Florida, Larry tried to overdose on drugs.

(Doc. 41-34 at 45-47, ¶¶ 138-42).

The Respondent makes two arguments in response. First, she argues the CCA correctly held that counsel's failure to present a family member's irrational conduct could not conceivably prejudice Saunders. (Doc. 47 at 61 (quoting Saunders II, 249 So. 3d at 1172)). Second, the Respondent contends that much of the information Saunders complains went unpresented was in fact submitted into evidence through Ms. Terrell's assistant's notes. She therefore argues the

CCA's decision was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of facts.

The CCA dismissed this claim, holding no material issue of fact or law existed that would entitle Saunders to relief. It specifically held:

> In regard to Saunders's argument that counsel failed to present evidence of his family history of mental illness, Saunders merely pleaded that counsel failed to present evidence indicating that his family members had a history of irrational conduct. (C. 70-71.) In Alabama "[a] defendant in a capital-murder case is entitled to an individualized sentencing determination." Scott v. State, 163 So. 3d 389, 467 (Ala. Crim. App. 2012). We fail to see how the absence of any of the information concerning the irrational conduct of Saunders's family members would have resulted in any prejudice to Saunders.

Saunders II, 249 So. 3d at 1172.

The Supreme Court has held that trial counsel's failure to uncover and present any evidence of "family background" (among other personal, mitigating information) does not "reflect reasonable professional judgment." Porter, 558 U.S. at 40. However, as the Respondent correctly notes, trial counsel retained the services of a certified clinical social worker who conducted a report on Saunders. (Doc. 41-47 at 26-38). The report was admitted into evidence. The report noted Saunders's father's history of "alcohol abuse[.]" (Id. at 26). It also contained Saunders's mother's history of alcohol and substance abuse and depression. (Id.). Indeed, the report included the specific medications Saunders's mother took for her mental illness. (Doc. 41-47). The 12-page report was replete with Saunders's family's bouts with alcohol, mental illness, and the like. Thus, his family's history of mental illness was presented. Saunders's has not demonstrated the CCA's decision was contrary to or involved an unreasonable application of clearly established federal law. The claim is therefore **DENIED**.

      f.   Mr. Saunders's trial counsel provided ineffective assistance at the penalty phase of the trial by failing to investigate and adequately present evidence of Mr. Saunders's mental illness and drug and alcohol usage.

Saunders's sixth and final penalty-phase ineffective assistance of counsel claim centers upon his claim that his "[t]rial counsel inexplicably failed to present a mass of available mitigating evidence of Mr. Saunders's mental illness and drug and alcohol usage to the jury during the penalty phase." (Doc. 41-1 at 86, ¶ 133).[19] While conceding that trial counsel called a forensic psychologist and a clinical social worker to testify during the penalty phase, Saunders claims trial counsel failed to adequately develop the evidence, opting instead to examine both of them for relatively brief periods and have the State place their entire report into evidence. (Id. at 86-87, ¶ 134). Despite the reports being in evidence, Saunders argues trial counsel "failed to elicit testimony on these important issues." (Id. at 90, ¶ 135). What resulted, Saunders argues, is merely a "hollow shell" of testimony needed to particularize him. (Id. at 91, ¶ 134 (quoting Collier v. Turpin, 177 F.3d 1184, 1201-02 (11th Cir. 1999)).

The CCA rejected this claim on two apparent grounds. First, it held

> Saunders specifically pleaded that his trial counsel was ineffective for failing to more fully develop the testimony of Dr. Stanley Brodsky, a clinical psychologist, and Joanne Terrell, a clinical social worker. In his petition, Saunders merely recites a synopsis of the reports prepared by each of the two experts but failed to plead what questions counsel should have asked, or what counsel should have done, to elicit the testimony he maintained should have been presented. Saunders failed to plead "full facts" in regard to this claim, and it was correctly summarily dismissed. See Rule 32.6(b), Ala. R. Crim. P.

Saunders II, 249 So. 3d at 1171. And it also held that

> at the sentencing hearing trial counsel did present the testimony of a clinical psychologist, Dr. Stanley Brodsky. Dr. Brodsky testified that after evaluating Saunders he determined that Saunders suffered from a major depressive disorder, that he had experienced auditory hallucinations, that he had a history of alcohol and drug abuse, that he was suffering from polysubstance dependency, and that he had a diminished capacity to control himself at the time of the murder based on his psychological disorder and his ingestion of drugs.

---

[19] The Court has previously discussed Saunders' claim that counsel provided ineffective assistance by failing to investigate Saunders' mental illness and drug and alcohol usage. See III.B.2.c and III.B.2.d. The Court therefore discusses the presentation of mental illness and drug and alcohol usage.

<u>Saunders II</u>, 249 So. 3d at 1172.

Unlike in <u>Collier</u>, where trial counsel "presented almost none of the readily available evidence of [defendant's] background and character that would have led the jury to eschew the death penalty[,]" <u>Collier v. Turpin</u>, 177 F.3d 1184, 1202 (11th Cir. 1999), here trial counsel presented evidence of Saunders's background and character. Marie Young testified about Saunders's hellish upbringing and the abuse. Dr. Brodsky testified to Saunders's mental illness. He testified that he diagnosed Saunders with major depressive disorder. (Doc. 41-19 at 78). He also explained what the diagnosis means, which is that a person has "persistent periods of sadness almost every day, that it interferes with somebody's functioning" and is "associated with recurrent thoughts about death . . . ." (<u>Id.</u>). Dr. Brodsky also testified about polysubstance dependency and explained what polysubstance dependency means. (<u>Id.</u> at 81). Dr. Brodsky noted Saunders's history of (1) suicide attempts; (2) psychiatrical hospitalization; and (3) auditory hallucinations. (<u>Id.</u> at 79).  And Ms. Terrell testified about Saunders's alcohol and drug abuse.

Accordingly, the CCA's rejection of Saunders's claim that his trial counsel performed ineffectively at the penalty phase by failing to adequately present evidence of his mental illness and substance abuse was not an unreasonable application of or contrary to Supreme Court precedent. This claim does not entitle Saunders's relief and is therefore **DENIED**.

3. MR. SAUNDERS WAS DENIED DUE PROCESS BECAUSE THE COURT OF CRIMINAL APPEALS' HOLDING THAT THE TRIAL COURT COMPLIED WITH RULE 32 IS IN CONFLICT WITH PRIOR DECISIONS FROM THE ALABAMA COURT OF CRIMINAL APPEALS REQUIRING THE TRIAL COURT TO STATE ITS REASONS WHEN THE DENIAL OF A RULE 32 PETITION IS BASED ON THE COURT'S OWN KNOWLEDGE.

The first non-ineffective assistance of counsel claim Saunders alleges is that the state circuit court's one-page dismissal of Saunders's Rule 32 petition denied him due process. On February 11, 2010, Judge Wilters issued a one-page order that dismissed Saunders's 217-

paragraph, 68-page Rule 32 petition. (Doc. 41-37 at 2). The circuit court made four findings and delineated the findings based on the Rule 32 petition's sections. Saunders argues the CCA denied Saunders due process by affirming the trial court's dismissal. In other words, Saunders challenges the collateral appeal and not the conviction or sentence.

The Eleventh Circuit has held that "defects in state collateral proceedings do not provide a basis for habeas relief." Carroll v. Sec'y, DOC, 574 F.3d 1354, 1365 (11th Cir. 2009). This is because "a challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment-*i.e.*, the conviction itself-and thus habeas relief is not an appropriate remedy." Carroll, 574 F.3d at 1365. "Under 28 U.S.C. § 2254, a petitioner can file a federal habeas challenge to a state court judgment 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" Alston v. Dep't of Corr., Fla., 610 F.3d 1318, 1325 (11th Cir. 2010) (quoting 28 U.S.C. § 2254(a)). Because this claim attacks the Rule 32 proceedings, which is a post-conviction remedy and not a conviction or sentencing, it does not entitle Saunders to habeas relief. See James v. Culliver, 2014 WL 4926178, at *131 (N.D. Ala. Sept. 30, 2014) (denying habeas relief on petitioner's claim that he was deprived due process throughout his Rule 32 proceedings).[20] Accordingly, habeas relief on this basis is **DENIED**.

4. MR. SAUNDERS WAS DENIED DUE PROCESS DURING HIS TRIAL BECAUSE JURORS WERE IMPROPERLY EXCUSED FOR CAUSE.

Saunders argues that several jurors were struck for cause in an unconstitutional manner as a result of their aversion to the death penalty. Saunders argues that

> [t]he exclusion of these jurors violated Mr. Saunders's rights to due process, equal protection, a jury comprised of a fair cross section of the community, an impartial jury, a fair trial and a reliable sentencing guaranteed by the Fifth, Sixth, Eighth

---

[20] The Court need not reach the Respondent's argument that this claim should be denied because it is an allegation of state law error. (See Doc. 47 at 65-66).

and Fourteenth Amendments to the United States Constitution. The state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established United States Supreme Court precedent.

(Doc. 41-1 at 102-03, ¶ 151). Saunders argues "several jurors" were struck, but he failed to identify which veniremembers were actually struck. The CCA and the Respondent identified three jurors Saunders could be referencing. They are: J.E.C. (juror # 4), J.L.M. (juror # 45), and J.W.C. (juror # 51).

In response, the Respondent argues that the CCA correctly denied this claim. After "deducing" which veniremembers Saunders alleges were improperly excused, the Respondent points to the CCA's holding, which disputes that several (i.e., more than two) were struck, as one was not struck for cause but instead removed by agreement. As for the other two, the CCA held

> we conclude, as did the State in its brief on appeal, that Saunders's argument on appeal relates solely to the striking of veniremember no. 4, J.E.C.; veniremember no. 45, J.L.M.; and veniremember no. 51, J.W.C. Saunders objected to the striking of J.L.M. and J.W.C. However, he did not object to the striking of J.E.C.; therefore, we review that claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
>
> The transcript and the jury strike list indicate that not only did Saunders not object to J.E.C.'s being removed as a juror, but Saunders agreed to J.E.C.'s being removed. Specifically, the record reflects the following exchange:
>
>> "[Prosecutor]: Can I just say one thing? I don't think it will affect your consideration since we do have plenty, while the—while I don't think he should be struck for cause, we don't, since we have enough if the Court would like to let [J.E.C.] go, since he has relatives coming in to visit him, the State would have no objection.
>> "[Saunders's counsel]: Neither would the Defense, Your Honor.
>> "....
>> "THE COURT: We'll strike number [J.E.C.] by agreement. ..."
>
> (R. 342–43.) Thus, it is clear that J.E.C. was not struck for cause, as Saunders appears to argue on appeal, but was removed by agreement of the parties, and we find no error, plain or otherwise, as to this claim.

With respect to the striking for cause of veniremembers J.L.M. and J.W.C., the record reflects that during questioning by defense counsel during voir dire, J.L.M. stated that he would never vote for the death penalty. Specifically, he said: "If given those two options, life without parole or death, I would universally vote against the death penalty. I don't—I can't support the death penalty in any case." (R. 332.) J.L.M. stated that he understood that the death penalty was part of the criminal justice system and the laws of the State of Alabama, but he stated that he did not agree with them. J.L.M. also stated that, even if the trial judge instructed him to consider the death penalty as a sentencing option, there was no circumstance that he could think of in which he would vote to impose the death penalty. (R. 332–33.) J.W.C. stated during questioning by defense counsel that he could not consider the death penalty as a sentencing option for Saunders. J.W.C. said that he could not vote to impose the death penalty on Saunders because, he said, "he reminds me too much like a grandson or something, and I think I would have that emotion and I don't think I could put it aside." (R. 331.) J.W.C. also said that he could not set aside his personal feelings and follow the trial court's instructions to consider the death penalty for Saunders.

Saunders I, 10 So. 3d at 75. The entirety of the CCA's holding on this matter is that

each veniremember unequivocally stated that he would not be able to consider or vote for the death penalty in this case and that he could not set aside his personal beliefs and follow the trial court's instructions as to the sentencing options. Clearly, J.L.M.'s and J.W.C.'s views on the death penalty would have substantially impaired the performance of their duties as jurors. The trial court did not abuse its discretion when it granted the State's challenges for cause as to J.L.M. and J.W.C.

Id. at 76.

Two Supreme Court decisions guide this discussion. First, in Witherspoon v. Illinois, 391 U.S. 510 (1968), the Supreme Court held "that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Id. at 522. Witherspoon "held that the State infringes a capital defendant's right under the Sixth and Fourteenth Amendments to trial by an impartial jury when it excuses for cause all those members of the venire who express conscientious objections to capital punishment." Wainwright v. Witt, 469 U.S. 412, 416 (1985) (citing Witherspoon).

The second case is <u>Wainwright v. Witt</u>, 469 U.S. 412 (1985), a case in which the Supreme Court took an "opportunity to clarify [its] decision in <u>Witherspoon</u> . . . ." <u>Wainwright</u>, 469 U.S. at 424. There, the Supreme Court held the proper standard for determining when a veniremember may be excused for cause as a result of her aversion to capital punishment "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" <u>Id.</u> (quoting <u>Adams v. Texas</u>, 448 U.S. 38, 45 (1980)).

Saunders's contends that these jurors "passed" the <u>Wainwright</u> test in that they would "fully comply with the law in every way." (Doc. 41-1 at 101, ¶ 151).[21] As for J.W.C., during questioning he stated that "I don't think I could vote to give him the death penalty." (Doc. 41-45 at 141). The following exchange between J.W.C. and Saunders's trial counsel occurred:

> MR. DASINGER: You don't think you could put your personal feelings aside and follow the Judge's jury instructions?
>
> PROSPECTIVE JUROR: Candidly, he reminds me too much like a grandson or something, and I think I would have that emotion and I don't think I could put it aside.
>
> MR. DASINGER: But there's not any situation that you could imagine that could make you vote for the death penalty?
>
> PROSPECTIVE JUROR: Not that I would imagine right off, no.

(Doc. 41-4 at 142). With respect to J.L.M.'s responses, the exchange went similarly.

> PROSPECTIVE JUROR: If given those two options, life without parole or death, I would universally vote against the death penalty. I don't – I can't support the death penalty in any case.
>
> MR. DASINGER: I'm sorry. What –
>
> PROSPECTIVE JUROR: Joe Mcintosh.

---

[21] Saunders failed to indicate where in the record these allegedly unconstitutional strikes occurred and also neglected to point the Court to the CCA's holding related to this issue.

MR. DASINGER: Mr. Mcintosh, that's just your personal feeling, right?

PROSPECTIVE JUROR: Yes.

MR. DASINGER: But you understand that the death penalty is part of our system?

PROSPECTIVE JUROR: Yes, I do.

MR. DASINGER: That is part of the laws of the State of Alabama?

PROSPECTIVE JUROR: And I don't agree with them.

MR. DASINGER: And if the Judge were to instruct you that you were to consider the death penalty as well as consider life without the possibility of parole, you couldn't follow the Judge's instructions and consider –

PROSPECTIVE JUROR: Well, I wouldn't have a choice in that case, correct?

MR. DASINGER: Yes, sir.

PROSPECTIVE JUROR: Then I would make a choice.

MR. DASINGER: Correct. But you could choose, correct?

PROSPECTIVE JUROR: I would choose not to pick the death penalty.

MR. DASINGER: There is no circumstance that you could think of?

PROSPECTIVE JUROR: No, sir.

(Id. at 143-44). Following the questioning, the trial court struck both veniremembers for cause, over trial counsel's objections. (Id. at 151-53).

The Court concludes both members struck for cause expressed views which, at the very least, would impair or hinder their duties as a juror to act in accordance with the juror's oath. J.W.C. stated that he did not believe he could put aside his perception of Saunders as a grandson in order to impose the death penalty. And J.L.M. answered in the negative when trial counsel asked if he could vote to impose the death penalty under any circumstance. As a result, the CCA's decision was not contrary to or an unreasonable application of clearly established federal

law, nor did it constitute an unreasonable determination of the facts. Saunders's petition with respect to this claim is therefore **DENIED**.

> 5. THE IMPOSITION OF THE DEATH PENALTY IN THIS CASE CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT DUE TO MR. SAUNDERS'S MENTAL DISABILITY.

Saunders next raises an Atkins claim. See Atkins v. Virginia, 536 U.S. 304, 321 (2002) ("[D]eath is not a suitable punishment for a mentally retarded criminal."). Saunders alleges that, despite an absence of testing to indicate he is mentally retarded, the trauma and neglect he suffered in his upbringing "fits the same pattern of reasoning used in Atkins to prevent the mentally retarded from being executed."[22] (Doc. 41-1 at 104). Thus, Saunders urges the Court grant his Atkins habeas claim despite his concession that the psychological testing conducted does not indicate Saunders meets the legal definition of mentally retarded.

The Respondent responds by first arguing that even Saunders concedes he is not mentally retarded. (Doc. 47 at 68). And second, the Respondent argues the CCA correctly denied Saunders's Atkins claim when it held that "nothing in the Atkins opinion that [] remotely suggests that the United States Supreme Court intended its holding to extend beyond mentally retarded offenders to those offenders with a history of child abuse, and Saunders's attempt to extend the Atkins holding to his case is unpersuasive." Saunders I, 10 So. 3d at 113.

The United States Supreme Court held in Atkins that it was

> not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our "evolving standards of decency," we therefore conclude that such punishment is excessive and that the

---

[22] The Court quotes the legal term "mental retardation" to remain consistent with the parties' and prevailing court opinions' terminology. Otherwise, the court will use the term "intellectually disabled." This change in terminology is a change in name only and for the purposes of this opinion, the terms are synonymous, referring to the same condition.

Constitution "places a substantive restriction on the State's power to take the life" of a mentally retarded offender.

Atkins, 536 U.S. at 321 (quoting Ford, 477 U.S. at 405). As the Eleventh Circuit has explained,

> Although the Atkins Court alluded to clinical definitions propounded by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA"), it left to the states the development of standards for courts to employ in making a determination of whether an offender is mentally retarded. Thus, we look to Alabama case law for guidance because the Alabama Legislature has not enacted any legislation developing procedures by which a court may determine if a capital defendant is mentally retarded and thus ineligible for execution.

Thomas v. Allen, 607 F.3d 749, 752 (11th Cir. 2010) (internal citations omitted). The Alabama Supreme Court set forth its three-prong test for intellectual disability in Ex parte Perkins:

> [T]he Alabama Supreme Court has defined the test for mental retardation that rises to the level of prohibiting execution as having three components: (1) significant subaverage intellectual functioning (an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the manifestation of these problems during the defendant's developmental period (i.e., before the defendant reached age 18).

Ex parte Perkins, 851 So. 2d 453, 456 (Ala. 2002). The Eleventh Circuit has applied the common clinical definition to consider whether a death row inmate's intellectual disability renders him or her "mentally retarded" under the Atkins standard. Smith v. Campbell, 620 F. App'x 734, 747 (11th Cir. 2015).[23] This entails "significant or substantial deficits in adaptive behavior, he must have concurrent deficits or impairments in ... at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." Id. at 747-48.

Saunders has failed to show how the "pathological lifestyle" in which he was reared rendered him "mentally retarded" under any definition acceptable under an Atkins claim. Having

---

[23] The Court recognizes that "although an unpublished opinion may be cited as persuasive authority, 11th Cir. R. 36–2, it is not binding authority." Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co., 480 F.3d 1254, 1260 n.3 (11th Cir. 2007).

reviewed the CCA's decision on this claim, the Court concludes it was neither contrary to nor an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts. Saunders's <u>Atkins</u> claim is **DENIED**.

6. ALABAMA'S METHOD OF EXECUTION BY LETHAL INJECTION IS CRUEL AND UNUSUAL PUNISHMENT.

Saunders next contends Alabama's method of execution constitutes cruel and unusual punishment and violates Saunders's constitutional right guaranteed by the Eighth Amendment.[24] Allowing the lethal injection procedure to take place contravenes Justice Stevens' concurrence in <u>Baze v. Rees</u>, 553 U.S. 35 (2008), Saunders argues. And finally, Saunders argues the state court's resolution of this claim was a decision that was contrary to and involved an unreasonable application of established Supreme Court law. Saunders requests a hearing to evaluate Alabama's lethal injection protocol. (Doc. 41-1 at 105).

The Respondent contends Saunders's method-of-execution claims are inappropriate for federal habeas petitions, and instead must arise in a separate 42 U.S.C. § 1983 claim. (Doc. 47 at 69). Citing Eleventh Circuit precedent, she urges the Court reject Saunders's method of execution claim because it is properly brought pursuant to a § 1983 claim, which is "mutually exclusive [from a habeas petition]: if a claim can be raised in a federal habeas petition, the same claim cannot be raised in a separate § 1983 civil rights action." (Doc. 47 at 69 (quoting <u>Hutcherson v. Riley</u>, 468 F.3d 750, 754 (11th Cir. 2006)).

The Respondent is correct. "The line of demarcation between a § 1983 civil rights action and a § 2254 habeas claim is based on the effect of the claim on the inmate's conviction and/or sentence." <u>Hutcherson</u>, 468 F.3d at 754. Challenges to the lawfulness of one's confinement or

---

[24] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

the validity of one's conviction properly fall within the gambit of a § 2254 petition. A challenge to the circumstances of one's confinement is properly addressed under § 1983. McNabb v. Comm'r Ala. Dep't of Corr., 727 F.3d 1334, 1344 (11th Cir. 2013).

> Usually, an inmate who challenges a state's method of execution is attacking the means by which the State intends to execute him, which is a circumstance of his confinement. It is not an attack on the validity of his conviction and/or sentence. For that reason, "[a] § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures."

Id. (quoting Tompkins v. Sec'y, Dep't of Corr., 557 F.3d 1257, 1261 (11th Cir. 2009)). See also Rivera v. Humphrey, 2017 WL 6035017, at *3 (S.D. Ga. Dec. 6, 2017) ("Petitioner's claim challenges the lethal-injection procedure, not the constitutionality of his conviction. Thus, it is not a cognizable habeas claim."); James, 2014 WL 4926178, at *149 ("[C]laims challenging lethal injection protocols as cruel and unusual punishments proscribed by the Eighth Amendment to the United States Constitution are properly brought in actions bottomed upon 42 U.S.C. § 1983, rather than as an independent claim within a *habeas* petition."); King v. Chatman, 2014 WL 1365415, at *3 (S.D. Ga. Apr. 7, 2014) ("By challenging the state's method of execution, Petitioner is challenging a circumstance of his confinement rather than attacking the validity of his conviction or sentence-thereby making his [§ 2254] claim non-cognizable."). Here, Saunders plainly challenges the method of execution. Accordingly, this claim does not entitle him to habeas relief pursuant to § 2254 and Saunders's claim is **DISMISSED**.

7. THE ALABAMA CAPITAL STATUTE IS UNCONSTITUTIONAL ON ITS FACE.

Saunders next argues Alabama's capital statute is unconstitutional on its face because "it allows a judge, rather than a jury, to make the ultimate factual findings upon which each death sentence is predicated." (Doc. 41-1 at 106, ¶ 158). Because the state vests such fact-finding authority with a judge instead of a jury it contravenes Supreme Court cases such as Ring v.

*Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), that, in Saunders's words stand for the proposition that "a jury rather than a judge must find the existence of statutorily defined aggravating circumstances that permit imposition of the death penalty before a person may be sentenced to death." (Doc. 41-1 at 106, ¶ 158). Saunders second faults the sentencing scheme because, according to Saunders, it "fail[s] to require that the requisite finding be made beyond a reasonable doubt." (Id. at 108, ¶ 161).[25] And Saunders third attacks Alabama's capital statute as unconstitutional "because it allows a less-than-unanimous jury to recommend that a person be sentenced to death." (Id. at 110, ¶ 164).

The Respondent argues that this claim was raised but not exhausted on postconviction review, rendering it procedurally defaulted. (Doc. 47 at 72). The Respondent also proffers an alternative argument on the merits. As to Saunders's first argument, the Respondent cites to Ex parte Bohannon, 222 So. 3d 525 (Ala. 2016). In Ex parte Bohannon, the Alabama Supreme Court acknowledged Apprendi's command that "any fact that elevates a defendant's sentence above the range established by a jury's verdict must be determined by the jury." Id. at 532 (citing Apprendi). And the Alabama Supreme Court explained that "Ring holds that the Sixth Amendment right to a jury trial requires that a jury 'find an aggravating circumstance necessary for imposition of the death penalty.'" Id. (quoting Ring, 536 U.S. at 585). The Alabama Supreme Court determined Alabama's capital sentencing scheme remained constitutional because "a jury, not the judge, determines by a unanimous verdict the critical finding that an aggravating circumstance exists beyond a reasonable doubt to make a defendant death-eligible, Alabama's capital-sentencing scheme does not violate the Sixth Amendment." Id. at 532.

---

[25] Saunders argues that the absence of a specific standard (necessarily lacking any beyond a reasonable doubt standard) violates constitutional prohibitions on cruel and unusual punishment. (Doc. 41-1 at 110, ¶ 163).

The Respondent also argues that aggravating circumstances were proved beyond a reasonable doubt because the jury returned a unanimous guilty verdict during the guilt phase of trial related to Saunders's two capital charges. Count one charged intentional murder during a robbery and count two charged intentional murder during a first-degree burglary. The jury unanimously convicted Saunders on both counts. (Doc. 41-15 at 2). And finally, the Respondent argues Saunders lacks standing to attack Alabama's judicial override sentencing scheme "because his is not an override case. Saunders's jury unanimously recommended death, and the trial court accepted that recommendation." (Doc. 47 at 73).

### 1. *Procedural Default*

The Respondent argues that this claim was discussed but not exhausted on postconviction review because Saunders "failed to fairly and adequately present [the claim]." (Id. at 72 n.206). Saunders raised this claim in his original Rule 32 petition to the Baldwin County Circuit Court. There, he raised the claims presented almost verbatim to what he raises in this § 2254 petition. (Doc. 41-34 at 61-66). However, in his appeal to the CCA, he only challenged this claim on the basis that they should not have been summarily dismissed. (Doc. 41-38 at 84 ("The remaining claims in Saunders's Rule 32 Petition should not have been summarily dismissed.")).

On appeal, the CCA held Saunders's failure to comply with ALA. R. APP. P. 28(a)(10) resulted in his waiving of the argument, and the CCA declined to address the merits of Saunders's claim.[26] Alabama Rule of Appellate Procedure 28(a)(10) requires all briefs contain an argument with contentions of the issues presented and citations to the cases for support of those contentions. The CCA cited its own precedent, C.B.D. v. State, 90 So. 3d 227, 239 (Ala.

---

[26] ALA. R. APP. P. 28(a)(10) states that the brief shall contain "An argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on."

Crim. App. 2011), for the proposition that failing to comply with that rule constitutes a waiver. Saunders II, 249 So. 3d at 1172.

Rule 28 is essentially an effort at judicial economy, requiring appellants and petitioners explicitly define the issue on appeal and cite to relevant authority in support of its argument. "The purpose of Rule 28, Ala. R. App. P., outlining the requirements for appellate briefs, is to conserve the time and energy of the appellate court and to advise the opposing party of the points he or she is obligated to make." Ex parte Borden, 60 So. 3d 940, 943 (Ala. 2007). Failure to comply with its mandate can result in harsh consequences. "Recitation of allegations without citation to any legal authority and without adequate recitation of the facts relied upon has been deemed a waiver of the arguments listed." Hamm v. State, 913 So. 2d 460, 491 (Ala. Crim. App. 2002) (citing Gay v. State, 562 So. 2d 283, 289 (Ala. Crim. App. 1990)).

Rule 28(a)(1) and its attendant waiver are not boundless. Taylor v. Dunn, 2018 WL 575670, at *16 (S.D. Ala. Jan. 25, 2018) ("Alabama law specifies that Rule 28(a)(10) is not to be liberally or gratuitously applied in the interests of convenience or expedience to whittle down a voluminous appeal."). "[W]aiver of an argument for failure to comply with Rule 28(a)(10), Ala. R. App. P., has been limited to those cases where there is no argument presented in the brief and there are few, if any, citations to relevant legal authority, resulting in an argument consisting of undelineated general propositions." Ex parte Borden, 60 So. 3d at 944.

Saunders's § 2254 petition with respect to the sentencing scheme made nary a mention of the CCA's holding that he waived his substantive argument (i.e., that Alabama capital sentencing scheme is facially unconstitutional), opting to instead vaguely assert that "[t]he state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established United States Supreme Court precedent." (Doc.

41-1 at 111, ¶ 165). He also did not address the Respondent's procedural default argument in his Reply. (See Doc. 50 at 13).

Although Saunders included these arguments within his initial Rule 32 petition to the circuit court, which included five and one-half pages of text addressing how and why Alabama's capital sentencing statute is unconstitutional, he devoted less than one-half of a page in his state court appellate brief. Indeed, much of that half-page was spent explaining the issue. The other was a concession "that these claims were (or could have been) raised at trial and/or on direct appeal . . . ." (Doc. 41-38 at 84). Saunders inserted only one-half of a sentence devoted to the argument. He argued "the trial court should nevertheless consider all of these claims in totality in determining whether Saunders's conviction and sentence of death accorded with constitutional mandates." (Id. at 84-85). This threadbare argument is exactly the type Rule 28 seeks to curtail, as it barely addressed an argument, failed to specify which issue Saunders claims the CCA should have addressed, and did not discuss which "cases, statutes, other authorities, and parts of the record" supported his claim. The circuit court dismissed no fewer than five sections of Saunders's original Rule 32 petition. (See Doc. 41-37 at 2). Rule 28(a)(10) simply requires more than a one-sentence argument why those five sections of his brief should have been considered.

The Court's analysis does not end there, for "[t]he doctrine barring procedurally defaulted claims from being heard is not without exceptions." Trevino v. Thaler, 569 U.S. 413, 421 (2013). Normally, "[a] state court's rejection of a petitioner's [federal] constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." Borden, 646 F.3d at 808 (quoting Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001)). Nonetheless, "a habeas petitioner may overcome a procedural default if he can show adequate cause and actual prejudice, or, alternatively, if the failure to consider the merits of his claim

would result in a fundamental miscarriage of justice." Id. at 808 n.26 (11th Cir. 2011). Saunders does not argue that either exception exists. Because the CCA dismissed this claim on an independent and adequate state ground, it is **procedurally defaulted** from federal habeas review.

### 2. *Alternative Merits Based Ruling*

And even if this claim was not procedurally defaulted and therefore barred from habeas review, the Court would be obliged to deny it on the merits. The Eleventh Circuit has specifically held that when a jury finds the existence of an aggravating circumstance (like the jury did here), nothing in Ring or other Supreme Court precedent forbids the use of an aggravating circumstance in a jury's verdict. As the Eleventh Circuit held in another Alabama death penalty habeas case, "The Alabama Supreme Court's conclusion here—that the Sixth Amendment is satisfied under Ring if a jury finds a qualifying aggravating factor at the guilt phase—is one that fairminded jurists could agree with." Waldrop v. Comm'r, Alabama Dep't of Corr., 711 F. App'x 900, 923 (11th Cir. 2017), cert. denied sub nom. Waldrop v. Dunn, 139 S. Ct. 118 (2018). In this case, the jury convicted Saunders on two counts at the guilt phase that constituted aggravating circumstances: that he committed the murder during a robbery and that he committed the murder during a burglary. (Doc. 10-439 at 2). Both convictions constitute an aggravating circumstance under Alabama law. See Ala. Code § 13A-5-49(4). Therefore "the jury found the existence of a qualifying aggravator beyond a reasonable doubt when it returned its guilty verdict." Id.

### 8. THE PROSECUTOR UTILIZED H[ER] PEREMPTORY CHALLENGES IN A RACIALLY DISCRIMINATORY MANNER.

Saunders next argues that the state court's adjudication of his Batson claim was a decision contrary to and involved an unreasonable application of clearly established United States Supreme Court precedent. Specifically, Saunders argues two

jurors were struck from service on the petit jury on the sole basis of race. Jurors 8 and 238, [A.A.] and [E.W.], are black females and were struck for no reason other than their race. The trial court held that there had been no prima facie case of racial discrimination made. Mr. Saunders was prejudiced by this action of the trial court, which resulted in the denial of a fair trial.

(Doc. 41-1 at 111, ¶ 166).

When trial counsel made a <u>Batson</u> challenge, the Respondent asserts, his sole contention was that A.A. and E.W. were the only black women veniremembers remaining. (Doc. 47 at 74). She therefore argues the CCA, on direct appeal, correctly upheld the trial counsel's denial of Saunders's <u>Batson</u> motion because "an objection based on numbers alone does not support the finding of a prima facie case of discrimination and is not sufficient to shift the burden to the other party to explain its peremptory strikes." (Doc. 47 at 74) (quoting <u>Ex parte Walker</u>, 972 So. 2d 737, 741 (Ala. 2007)) (internal brackets and ellipsis omitted).

Trial counsel's objection proceeded as follows:

THE COURT: Before we bring in the jury, are there any objections?

MR. DASINGER: Yes, Your Honor, as to the State's striking Juror No. 8, [A.A.]. She was the black female. The State had also struck No. 238 [E.W.]. Those are the only two black women that were on the jury voir dire selection list after, by agreement, we had let the other one go yesterday. It's not a fair representation of the community. The State has not cited any race-neutral reason for striking those two people.

THE COURT: Anything else, Mr. Dasinger?

MR. DASINGER: As far as the venire, no.

THE COURT: The motion is denied.

(Doc. 41-4 at 162). The trial court denied trial counsel's motion without first eliciting the State's response.[27]

---

[27] Having apparently concluded Saunders' trial counsel failed to make a prima facie claim, this was all that was necessary. Eleventh Circuit precedent is that "the establishment of a prima facie case is an absolute precondition to

"Batson requires a court to undertake a three-step analysis to evaluate equal protection challenges to a prosecutor's use of peremptory challenges." McGahee v. Alabama Dep't Of Corr., 560 F.3d 1252, 1256 (11th Cir. 2009).

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

Id. (quoting Miller-El v. Cockrell, 537 U.S. 322, 328-29 (2003)). This inquiry involves only the first step: a prima facie showing.

"In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances." Batson v. Kentucky, 476 U.S. 79, 96 (1986). "[A] defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." Johnson v. California, 545 U.S. 162, 170 (2005).

The CCA, on direct appeal, faulted Saunders's Batson argument due to its sole reliance "on numbers alone when he objected to the State's strikes of the veniremembers . . . ." Saunders I, 10 So. 3d at 78. It held that "Saunders's Batson motion was based solely on the basis that two black veniremembers were struck. Because Saunders relied on numbers alone when he objected to the State's strikes of the veniremembers, the trial court correctly denied Saunders's Batson motion because Saunders failed to establish a prima facie case of discrimination." Id.

In doing so, the CCA relied upon an earlier Alabama Supreme Court case, which held that "[a]n objection based on numbers alone, however, does not support the finding of a prima

---

further inquiry into the motivation behind the challenged strike." United States v. Ochoa-Vasquez, 428 F.3d 1015, 1038 (11th Cir. 2005) (quoting Lowder, 236 F.3d at 636).

facie case of discrimination and is not sufficient to shift the burden to the other party to explain its peremptory strikes." Ex parte Walker, 972 So. 2d 737, 741 (Ala. 2007). There, petitioner Walker's "objection was based totally on the number of African-Americans the State struck from the jury. When the trial court asked for facts or evidence to support the objection, Walker was unable to provide any. The trial court properly concluded that Walker had not presented a prima facie case of discriminatory use of peremptory strikes." Id. at 741-42.[28]

The CCA's holding that reliance on numbers alone fails to satisfy part one's prima facie requirement is neither contrary to nor an unreasonable application of clearly established law. See United States v. Saylor, 626 F. App'x 802, 807 (11th Cir. 2015) ("The prima facie case determination cannot be based on numbers alone, but should be made in light of the totality of the circumstances."). Saunders's claim for habeas relief on this basis is **DENIED**.

9. IT WAS ERROR TO DENY SUPPRESSION OF A STATEMENT.

After detaining Saunders, law enforcement officials transported him to the Foley Police Department. (Doc. 41-8 at 75). Once there, he was taken to "investigations" where officers sat him down at a table and "probably" handcuffed him to a chair. (Id. at 76). Several officials were present, including Lt. White, a couple of Baldwin County District Attorney's Office investigators, and a Baldwin County Sheriff's Department investigator. (Id. at 77). Then the interrogation began.

Sgt. Fuqua began to interview Saunders when only he and Lt. White were in the room. (Id.). Before asking any questions, Sgt. Fuqua testified he Mirandized Saunders. The State introduced a Foley Police Department "Advice of Rights" document Saunders signed, witnessed by both Sgt. Fuqua and Lt. White. (Id. at 34). This document was executed at 9:50 a.m. on July 10, 2004. (Id.). Sgt. Fuqua testified that Lt. White initiated the interview, the first portion of

---

[28] The record before the Court does not reveal what percentage of African Americans comprised the venire panel.

which lasted 15 to 20 minutes. (Id. at 83). According to Sgt. Fuqua, Saunders offered to "tell [them] the truth" about Mr. Clemons' death if they permitted him to first smoke a cigarette, and they obliged. (Id. at 85-86). According to Sgt. Fuqua's account, after the break Saunders indicated he would only "confess or talk about what he did in [Sgt. Fuqua's] presence." (Id. at 87). Sgt. Fuqua honored Saunders's wish and he interrogated Saunders alone. (Id. at 89). Sgt. Fuqua testified that Saunders told him the following:

> He admitted to me that he murdered Mr. Clemons by striking him with a crowbar. He admitted that he went into the residence by feigning having an asthma attack and Ms. Clemons came to the door, she helped him, brought him into the house, gave him a glass of water.

(Id. at 90).[29]

Saunders argues the trial court's failure to suppress a statement he made, in which he confessed to killing Mr. Clemons, and the CCA decision to affirm that decision, were made in error. The trial court's failure to suppress this statement under these circumstances, Saunders argues, "violated Mr. Saunders's rights to due process, freedom from self-incrimination and a fair trial as protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution." (Doc. 41-1 at 112-13, ¶ 169). However, Saunders neglects to include *why* the CCA's decision was contrary to or involved an unreasonable application of clearly established Supreme Court precedent. Saunders cited three Supreme Court cases (in addition to Miranda): Schneckloth v. Bustamonte, 412 U.S. 218 (1973), Greenwald v. Wisconsin, 390 U.S. 519, 521 (1968), and Culombe v. Connecticut, 367 U.S. 568 (1961). However, he failed to explain how these cases support his position.

Saunders argues his confession should have been suppressed based on apparently five reasons: (1) he was intoxicated on crack cocaine and beer, (2) he had been recently arrested, (3)

---

[29] Sgt. Fuqua testified that although at the time of the interview he believed a recorder was recording the conversation, when he later attempted to play the recording no recording existed. (Doc. 41-8 at 104).

he was mentally ill, (4) he had his will overborne, and (5) the failure to record the confession rendered the statement "unreliable." (Doc. 41-1 at 112, ¶ 169).

"The Fifth Amendment prohibits the use of an involuntary confession against a defendant in a criminal trial." United States v. Thompson, 422 F.3d 1285, 1295 (11th Cir. 2005). "'[V]oluntariness' has reflected an accommodation of the complex of values implicated in police questioning of a suspect." Schneckloth v. Bustamonte, 412 U.S. 218, 224-25 (1973). "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." Id. at 226. The prior consumption of alcohol or withdrawal from alcohol can render a suspect's statement involuntary. See Hubbard v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003); United States v. Harris, 613 F. Supp. 2d 1290, 1301 (S.D. Ala. 2009) ("[I]ntoxication is an appropriate factor that may be considered in assessing the voluntariness of a statement.").

Saunders indisputably consumed both alcohol and drugs the night preceding his confession. He testified that after leaving the Clemons' residence he (1) consumed part of a 12-pack of Bud Light; (2) smoked a marijuana joint; and (3) took a Xanax. (Doc. 41-10 at 36). On the day he murdered Mr. Clemons, he also smoked $150 worth of crack. (Doc. 41-10 at 10). Indeed, during cross examination Saunders testified that after murdering Mr. Clemons, he went to a pond and smoked more crack. (Doc. 41-10 at 51).

When asked how fast his "head clear[s] up" after taking a toke of crack, Saunders answered that it could be as short as 10 or 30 minutes, but that "[it] depends on how much you're smoking." (Id. at 56).

The CCA held that

Nothing in the record before us indicates that Saunders's statement was involuntary because he was under the influence of drugs or alcohol. To the contrary, all the testimony in the record indicates that Saunders was not under the influence of drugs or alcohol when he gave his statement. Saunders himself testified that his head cleared fairly quickly after he smoked crack cocaine, and that he was "almost clear" while he was still in the Clemonses' residence. Although Saunders testified that he ingested more drugs and drank alcohol after he committed the crime, neither Saunders nor any other witness testified that Saunders was under the influence of drugs or alcohol or that Saunders was in any way impaired several hours later when he gave his statement. Therefore, Saunders's statement was not due to be suppressed on the ground that Saunders was substantially impaired as a result of drug and alcohol intoxication.

Saunders I, 10 So. 3d at 81.

Saunders does not challenge the CCA's adjudication of this claim based on its determination of fact, but instead argues it is an unreasonable application of established Supreme Court precedent. Aside from merely pleading "Mr. Saunders was intoxicated on crack cocaine and beer," (Doc. 41-1 at 112, ¶ 169), Saunders points to nowhere in the record where testimony existed to factually support his claim that at the time he confessed he remained intoxicated such that his confession was involuntary. And as the Respondent noted and the CCA held, testimony from law enforcement officials actually indicated Saunders did not appear intoxicated. For example, Officer Kye Belser, when asked by trial counsel to describe Saunders's demeanor and whether Saunders appeared to be under the influence of alcohol or drugs at the time Saunders was arrested, responded in the negative. (Doc. 41-8 at 60). Sgt. Fuqua also testified that Saunders did not appear to be impaired or under the influence of drugs or alcohol during the 10-minute cigarette break prior to Saunders's confession. (Id. at 86-87). The State court's conclusion that Saunders was not under the influence of alcohol or drugs at the time he gave his statement, and therefore not "substantially impaired" is not an unreasonable determination of the facts. Nor was the resulting legal determination – i.e., that the statement was not due to be suppressed – contrary to or an unreasonable application of clearly established law.

With regard to Saunders's argument that his will was overborne, the CCA held that

> The testimony in the record establishes that Saunders was not coerced or pressured into making his statement and that no inducements were offered to Saunders for making his statement. Viewing the totality of the circumstances, we conclude that no illegal inducements were offered to Saunders in order to induce a confession, and that his will was not overborne by any promises from any of the law-enforcement officers. Therefore, Saunders's confession was not due to be suppressed on this ground.

Saunders I, 10 So. 3d at 81.

"Absent police conduct causally related to the confession, there is no basis for concluding that any state actor has deprived a criminal defendant of due process of law." United States v. Thompson, 422 F.3d 1285, 1296 (11th Cir. 2005) (quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)) (internal ellipsis omitted). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." Thompson, 422 F.3d at 1295-96 (quoting United States v. Mendoza–Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992)). As the CCA found, evidence did not support Saunders's argument that officers impermissibly coerced or enticed Saunders sufficient to induce an improper confession. Thus, its determination in upholding the trial court's decision to deny Saunders's motion to suppress is not contrary to nor an unreasonable application of clearly established Supreme Court precedent.

Third, the CCA noted Saunders failed to argue that his alleged mental illness should result in a suppression of statement.[30] But the CCA held "[n]o evidence was presented at the guilt phase of the trial indicating that Saunders suffered from any type of mental illness; therefore, the record does not support Saunders's claim that a mental illness rendered his confession involuntary." Saunders I, 10 So. 3d at 82.

---

[30] The CCA therefore reviewed it for plain error. Saunders I, 10 So. 3d at 82.

"It is settled that statements or confessions made during a time of mental incompetency or insanity are involuntary and, consequently, inadmissible." Sullivan v. State of Ala., 666 F.2d 478, 482 (11th Cir. 1982). In Sullivan, the Eleventh Circuit acknowledged confessions given during a period of mental incompetency are involuntary. However, the Eleventh Circuit ultimately faulted the petitioner in Sullivan for failing to present medical evidence of his insanity (either during the trial or during the subsequent habeas proceedings). Sullivan, 666 F.2d at 483. Here, too, Saunders has not pleaded that Saunders's was mentally incompetent. The CCA's determination that suppression of Saunders's statement was not required was neither contrary to nor an unreasonable application of federal law. As the CCA noted, no mental health professional testified about Saunders's mental illness during the guilt phase of trial such that an intellectual disability rendered his confession involuntary.

And finally, the CCA discounted Saunders's position that the absence of an audio recording undermined the confession. Saunders I, 10 So. 3d at 82 ("However, Saunders offers no legal support for this assertion, and we find that the absence of an audiotape of a confession is not relevant to the admissibility of that confession. Rather, the absence of an audiotape is an issue that can be presented to the jury for it to consider in determining the weight and credibility of the confession."). And it rejected Saunders's contention. Id. ("The absence of an audiotape did not render Saunders's confession inadmissible; therefore, Saunders's confession was not due to be suppressed on this ground."). Saunders cites no support or case for the fact that an unrecorded confession should be suppressed. His argument that the CCA's decision was contrary to or an unreasonable application of federal law does not hold water. Thus, this claim is **DENIED**.

10. THERE WAS IMPROPER TESTIMONY ABOUT A LINEUP.

Officer Connie King visited Mrs. Clemons in the hospital the day following Saunders's attack. (Doc. 41-7 at 201). Officer King testified that Agnes Clemons identified Saunders in the lineup Officer King showed Mrs. Clemons. The following exchange occurred during Officer King's testimony:

> Q [Ms. Newcomb] Tell the jury, if you don't mind, how you went about showing her this lineup.
>
> A [Officer Connie King] When I went in, I explained to her that I had to take some photos of her injuries. And I asked her if she was up to looking at a photo lineup because she was in a lot of pain. And she told me that she did feel able to look at the lineup. She looked at the lineup. She looked at each picture carefully and then she pointed to number 6 and said that's him.
>
> Q Now, picture number 6, who is that?
>
> A That's Timothy Saunders.
>
> Q Is that the defendant in this case?
>
> A Yes, it is.
>
> Q Was the coloring of his hair different than how you observe the coloring in court today?
>
> A Yes.
>
> Q Was it -- the coloring that you observe in that picture?
>
> A Yes.
>
> Q Was it -- the coloring that you observe in that picture?
>
> A Yes.
>
> Q Do you recall -- well, this lineup was done after he had been brought into custody; is that correct?
>
> A I'm unsure of that.
>
> Q Okay. Do you know where you got the picture that you used in the lineup?

A No, I'm not positive. I believe I got it from our jail record, but I'm not positive of that.

(Id. at 205-06).

Saunders contends that "[t]he action by the trial court in allowing illegal testimony to bolster the photographic lineup identification resulted in an unfair conviction and was a violation of the rights to due process of law guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution." (Doc. 41-1 at 114, ¶ 172). Saunders cites Crawford v. Washington, 541 U.S. 36 (2004), and Pointer v. Texas, 380 U.S. 400 (1965), for the proposition that the CCA's holding contravened established Supreme Court precedent.

The Respondent first argues this claim is procedurally defaulted because Saunders raised only a version of this claim on direct appeal. That version was based upon Thomas v. State, while he now raises it based upon Crawford. The Respondent contends "[a]s he did not fairly present the federal-law claim to the state courts, this claim is procedurally defaulted." (Doc. 47 at 81). The Respondent also makes a merit-based argument. She argues that while the trial court originally erred (and the CCA's holding that it so erred was correct), the CCA correctly found that the trial court's admission of Officer King's testimony was harmless. (Id.). Relying upon Brecht v. Abrahamson, 507 U.S. 619 (1993), the CCA held that the trial court's error did not have a "substantial and injurious effect or influence in determining the jury's verdict." (Doc. 47 at 82) (quoting Brecht, 507 U.S. at 637).

The CCA held on direct appeal that

The general rule is that evidence by a third party of an extrajudicial identification is admissible in rebuttal of testimony tending to impeach or discredit the identifying witness, or to rebut a charge, imputation or inference of falsity." Aaron v. State, 273 Ala. 337, 345, 139 So. 2d 309, 316 (1962). In Aaron, the Alabama Supreme Court held that a third party's testimony about the prosecutrix's pretrial identification of the defendant was properly admitted because it was presented "in rebuttal of the inference raised on cross-examination

of the prosecutrix and [the third party witness] that the identification of the appellant by the prosecutrix was manufactured." Aaron, 273 Ala. at 344, 139 So. 2d at 316.

Here, Officer King's testimony was not presented as rebuttal of an inference that Mrs. Clemons's identification of Saunders was manufactured; therefore, it was improper. However, we conclude that the error in admitting Officer King's testimony was harmless. See, e.g., Lewis v. State, 889 So. 2d 623, 666 (Ala. Crim. App. 2003) (harmless-error rule applies in capital cases).

. . .

. . . Mrs. Clemons identified Saunders in court, and she testified that she had identified Saunders in a photographic lineup. Furthermore, Saunders testified at trial and he admitted to beating Mr. Clemons with a crowbar and to beating Mrs. Clemons repeatedly after he feigned an asthma attack to gain entry into the Clemonses' house. The identity of the assailant was never an issue in this case. Based on the facts before us, we conclude that the admission of Officer King's testimony was, at most, harmless error, and certainly did not rise to the level of plain error.

Saunders I, 10 So. 3d at 83-84.

### 1. *Procedural Default*

As previously noted, "[f]or a federal claim to be exhausted, the petitioner must have fairly presented it to the state courts." Lucas v. Secretary Dep't of Corrections, 682 F.3d 1342, 1351 (11th Cir. 2012) (citation and internal marks omitted). This "give[s] the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Raleigh v. Secretary, Florida Dep't of Corrections, 827 F.3d 938, 956 (11th Cir. 2016) (citation omitted). It is not sufficient "that a somewhat similar state-law claim was made." Kelley v. Secretary, Dep't of Corrections, 377 F.3d 1317, 1344-45 (11th Cir. 2004).

In his direct appeal, Saunders indeed cited a state case, Thomas v. State, 461 So. 2d 16, 20 (Ala. 1984), for the proposition that "action by the trial Court in allowing illegal testimony to bolster the photographic lineup identification resulted in an unfair conviction[.]" (Doc. 41-29 at 71). And he did so without mentioning Crawford. Nevertheless, Saunders invoked the Fifth,

Sixth, and Fourteenth Amendments (in addition to the relevant section of the Alabama Constitution). (Doc. 41-29 at 71-72).

To "fairly present" a claim, the petitioner is not required to cite "book and verse on the federal constitution." Lucas, 682 F.3d at 1352. Although the CCA did not address Saunders's claim in terms of his rights guaranteed under the federal constitution, "'this does not mean the claim was not presented to it[.]'" Id. (quoting Dye v. Hofbauer, 546 U.S. 1, 3 (2005)). The Eleventh Circuit, in Lucas, indicated courts may look to a petitioner's brief "to determine whether he mentioned the federal source of law on which he relies or a case deciding such a claim on federal grounds, or labeled the claim 'federal.'" Lucas, 682 F.3d at 1352 (internal ellipsis and bracket omitted) (quoting Baldwin, 541 U.S. at 32). There, the petitioner failed to "cite to *any* constitutional provision[,]" id. at 1353 (emphasis in original), much less the federal constitutional provision. Nor did the petitioner distinguish Florida's right of confrontation under the Florida constitution and that right guaranteed by the Sixth Amendment.

Here, Saunders noted to the CCA that the trial court's decision resulted in "a violation of the rights to due process of law guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution . . . ." (Doc. 41-29 at 71-72). Saunders's citation to (1) the Sixth Amendment of the United States Constitution and (2) his explicit invocation of the United States constitution leads the Court to generously conclude that Saunders properly placed the issue of his Sixth Amendment right to confront witnesses before the state courts.[31]

2. *Merits*

---

[31] The Court concludes that Saunders' citation to the Sixth Amendment of the United States Constitution would not require the state court to "read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." Baldwin v. Reese, 541 U.S. 27, 32 (2004).

Having concluded that Saunders exhausted this argument, the Court addresses the merits. The Respondent asserts that Officer King's testimony was harmless. Saunders protests that this incident "goes back to the above, that the cumulative error doctrine provides that an aggregation of non-reversible errors can yield a denial of the constitutional right to a fair trial, which would call for reversal." (Doc. 50 at 15).

"The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" Crawford, 541 U.S. at 42 (quoting U.S. CONST. Amend. VI). Thus, the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial . . . ." Id. 53-54. In this case, there was no Crawford violation. Although Officer King testified to Mrs. Clemons' pre-trial identification of Saunders, Mrs. Clemons appeared as a witness at trial.

As the CCA explained,

> Mrs. Clemons identified Saunders in court, and she testified that she had identified Saunders in a photographic lineup. Furthermore, Saunders testified at trial and he admitted to beating Mr. Clemons with a crowbar and to beating Mrs. Clemons repeatedly after he feigned an asthma attack to gain entry into the Clemonses' house. The identity of the assailant was never an issue in this case. Based on the facts before us, we conclude that the admission of Officer King's testimony was, at most, harmless error, and certainly did not rise to the level of plain error.

Saunders I, 10 So. 3d at 83-84. The CCA's holding was not contrary to or an unreasonable application of federal law, and it was not based on an unreasonable determination of the facts. Therefore, this claim is **DENIED**.

As to the trial court's error the CCA discussed, it was an evidentiary violation of state law and does not implicate a constitutional right. Accordingly, habeas relief is also denied on this basis.

11. THE CORONER TESTIFIED IMPROPERLY.

Dr. Kathleen Enstice testified during the State's case-in-chief. Dr. Enstice was employed by the Alabama Department of Forensic Sciences at the time Saunders killed Mr. Clemons. (Doc. 41-7 at 228). She performed Mr. Clemons' autopsy. (Doc. 41-7 at 234). Her testimony included her expert opinion on Mr. Clemons' cause of death ("blunt head trauma" (id. at 238)), his manner of death (homicide (id.)), and other critical observations generated during Mr. Clemons' autopsy. Her testimony also included expert opinion on the causes of Mr. Clemons' injuries. For instance, she testified injuries Mr. Clemons' sustained to his face were "inconsistent with laying down on a soft surface of grass and actually getting a bruise and scratch on the skin." (Doc. 41-8 at 12). Dr. Enstice testified the injury instead resulted from a blow. Dr. Enstice's testimony also included the position she believed Mr. Clemons' was in when he suffered the blows. She testified that the downward blood spatter she observed indicated Clemons "would have to be in a standing position[,]" (id. at 29), when the first blow was inflicted.

Saunders contends the coroner's testimony "went beyond the bounds allowed by United States law. This testimony was not confined to scientific knowledge." (Doc. 41-1 at 115, ¶ 174). The Respondent asserts that Alabama permits a properly trained coroner to testify (1) to the angle of the victim's wounds and (2) to the variations of position when the wounds are sustained. (Doc. 47 at 83). She therefore argues the CCA's decision, in which it found "no error, plain or otherwise, with respect to Dr. Enstice's testimony about the character and nature of Mr. Clemons's wounds and the position of Mr. Clemons's body when the injuries were inflicted upon him by Saunders[,]" was correct. Saunders I, 10 So. 3d at 86.

The CCA addressed this argument on direct appeal. It held that

At no time, however, did Dr. Enstice testify about the relative positions of Saunders and Mr. Clemons when Saunders struck the blows. Her testimony was limited to a description and nature of the wounds and about the position Mr. Clemons was in when he was struck, all of which was based on the evidence she

observed or information she had received about the location of Mr. Clemons's body when it was found.

Id. at 85. The CCA held Dr. Enstice's testimony was not in error.

Saunders relies upon state law for his argument that Dr. Enstice gave prohibited testimony "concerning the relative position of the parties at the time of the murder." (Doc. 50 at 16) (quoting Lane v. State, 673 So. 2d 825, 828-29 (Ala. Crim. App. 1995). However, such argument is unrelated to whether Saunders is in custody in violation of the Constitution or laws or treaties of the United States. The parties invite the Court to engage as to whether Dr. Enstice's testimony contravened Alabama court precedent regarding the appropriate form of coroner testimony. The Court declines to do so.

> A federal habeas petition may be entertained only on the ground that a petitioner is in custody in violation of the Constitution or laws or treaties of the United States. A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved. State courts are the ultimate expositors of their own state's laws, and federal courts entertaining petitions for writs of habeas corpus are bound by the construction placed on a state's criminal statutes by the courts of the state except in extreme cases.

McCullough v. Singletary, 967 F.2d 530, 535-36 (11th Cir. 1992) (internal citations omitted). See also Estelle v. McGuire, 502 U.S. 62, 63 (1991) (stating "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); James, 2014 WL 4926178, at *4 ("Claims that turn exclusively upon state law principles fall outside the reach of this court's authority to provide relief under § 2254."). The Court therefore will not assess whether Dr. Enstice's testimony ran afoul of Alabama state court cases the parties cite, namely Lane and Robitaille v. State, 971 So. 2d 43 (Ala. Crim. App. 2005).

Saunders amended petition relies upon Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993). Saunders cites Daubert for support of his proposition that a judge must ensure scientific testimony's reliance and reliability. Yet, his argument is not that Dr. Enstice's

testimony was unreliable; instead the gravamen of his argument is that Dr. Enstice's description of Mr. Clemons' position—Saunders uses the words "relative positions[,]" echoing the Alabama Court of Criminal Appeals cases—"went beyond the bounds allowed by United States law[,]" (Doc. 41-1 at 114, ¶ 174), and was not "confined to scientific knowledge." (Id.) Such tacit reliance upon state court law will not aid in Saunders's pursuit of habeas relief. Further, his citation to Daubert is equally unavailing. In the main, his argument does not even make a cursory attempt to convince this Court that any Daubert error warrants habeas relief. Even so, the Court readily concludes this claim does not warrant habeas relief. A Daubert error is an evidentiary one. And "[a]n evidentiary error does not justify habeas relief unless the violation results in a denial of fundamental fairness." Dickson v. Wainwright, 683 F.2d 348, 350 (11th Cir. 1982). Saunders does not come close to satisfying this standard.[32] The CCA's decision was neither contrary to nor an unreasonable application of federal law. Therefore, the claim is **DENIED**.

12. THE HOMICIDE WAS NOT HEINOUS AND CRUEL.

The trial court instructed the jury as to four types of aggravating circumstances, including whether the murder was "especially heinous, atrocious, and cruel as compared to other capital offenses." (Doc. 41-22 at 10; Doc. 47 at 22-23); Ala. Code § 13A-5-49(8). Specifically, the trial court instructed that

> the final aggravating circumstance that you may consider is whether the capital offense was especially heinous, atrocious or cruel compared to other capital offenses.
>
> The term heinous means extremely wicked or shockingly evil.
>
> The term atrocious means outrageously wicked and violent.

---

[32] See Black v. Thomas, 2006 WL 2547405, at *7 (M.D. Ala. Aug. 31, 2006) (quoting Lisenba v. California, 314 U.S. 219, 228 (1941)) ("[T]the holding in Daubert is not premised on the Constitution. Moreover, only when evidentiary errors 'so infused the trial with unfairness as to deny due process of law' is habeas relief warranted.").

The term cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.

Now, what is intended to be included in this aggravating circumstance is those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses. For a capital offense to be especially heinous and atrocious, any brutality involved in it must exceed that which is normally present in any capital offense.

For a capital offense to be especially cruel, it must be a consciousness or pitiless crime, which is unnecessarily tortuous to the victim.

All capital offenses are heinous, atrocious and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness, atrociousness, or cruelty exceed that which will always exist when a capital offense is committed.

(Doc. 41-22 at 6-7). The trial court explained that before the jury could consider recommending that Saunders be sentenced to death, the jury must be "convinced beyond a reasonable doubt based on the evidence that at least one or more of the aggravating circumstance exist." (Id. at 7). If the jury found beyond a reasonable doubt that one or more of the aggravating circumstances existed, the trial court instructed that it must then consider the mitigating circumstances. In the final analysis, the trial court instructed the jury to determine whether "the aggravating circumstance or circumstances outweigh the mitigating circumstances." (Id. at 3).

Saunders argues the trial court erred in permitting

the jury to decide this issue when there was no evidence that the death was heinous, atrocious or cruel. Insufficient evidence and the arbitrary and capricious application of the 'heinous, atrocious, or cruel' aggravating circumstance failed to satisfy due process or the Eighth Amendment standards established by Godfrey v. Georgia, 446 U.S. 420 (1980).

(Doc. 41-1 at 115-16, ¶ 177). Saunders argues this error deprived Saunders of the right "to due process, a fair trial and a reliable sentencing protected by the Fifth, Sixth, Eighth and Fourteenth Amendments . . . ." (Id. at 116, ¶ 178). Here, Saunders does not argue that Alabama's statute is unconstitutional. Instead, Saunders argues that insufficient evidence existed for the trial court to

allow the jury to decide whether Mr. Clemons' death was especially heinous, atrocious, and cruel. The crux of Saunders's argument is that Mr. Clemons' death was immediate and without warning. (Doc. 50 at 16).

The CCA's decision included three factors used to indicate whether a capital offense is especially heinous, atrocious, or cruel: "(1) the infliction on the victim of physical violence beyond that necessary or sufficient to cause death; (2) appreciable suffering by the victim after the assault that ultimately resulted in death; and (3) the infliction of psychological torture on the victim." Brooks v. State, 973 So. 2d 380, 418 (Ala. Crim. App. 2007). A long line of Alabama cases focuses upon whether the victim experienced a swift death or one that was prolonged, causing unnecessary suffering. See e.g. Norris v. State, 793 So. 2d 847, 859 (Ala. Crim. App. 1999) ("the critical inquiry is whether the victims were aware or conscious"); Ex parte Rieber, 663 So. 2d 999, 1003 (Ala. 1995) ("evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel"); White v. State, 587 So. 2d 1218, 1234 (Ala. Crim. App. 1990), aff'd sub nom. Ex parte White, 587 So. 2d 1236 (Ala. 1991) (same). The parties dispute whether Mr. Clemons experienced prolonged suffering, fear, or pain prior to his death (as the Respondent argues and the CCA held) or whether his death was instantaneous (as Saunders argues).

The trial court, in its sentencing order, issued the following findings concerning whether Mr. Clemons' death was heinous, atrocious, or cruel. (Doc. 41-27 at 7-8).

> The blows to Melvin Clemons' face and the injuries to the neck were inflicted prior to death and if the first blow with the crowbar was to a standing or kneeling victim, as supported by the evidence, the victim could not have been unconscious. Therefore, the killing of Melvin Clemons was not immediate. The killing took place at night in the darkness of Melvin Clemons' yard and with the knowledge of 77[-]year[-]old Melvin Clemons that his wife of 40 years, Agnes Clemons, was

alone in their house and was now or soon to be the target of the Defendant, since he, Melvin Clemons, had no money on himself. It must also be assumed that Melvin Clemons knew he was going to die after the facial blows and neck/throat injury, since he knew his assailant and would be able to identify him as being the individual who borrowed the crowbar from him earlier in the day.

The evidence also showed that Melvin Clemons was returning to his house when the fatal blows were delivered, which indicates he was returning to call the police or he was returning to protect his wife; either of these scenarios show the victim knew something was seriously wrong that night in the yard of his home. The Court gives great weight to this aggravating circumstance. No aggravating circumstances other than those listed above were established by the State.

(Id. at 8).[33] The trial court gave "great weight" to this aggravating circumstance. (Id. at 8).

The CCA affirmed the trial court's decision to instruct the jury on the heinous, atrocious, or cruel aggravating circumstance. In doing so, it examined Dr. Enstice's testimony. It determined that her testimony demonstrated that Mr. Clemons suffered injuries while he remained upright, and later blows to the head were consistent with him laying facedown during the blows. These blows occurred immediately prior to Mr. Clemons' death but would nevertheless have been painful. Saunders I, 10 So. 3d at 110. Moreover, the CCA recounted evidence that Mr. Clemons also experienced nonlethal injuries, such as bruises, scrapes, and cuts. These were experienced, in Dr. Enstice's expert opinion, while Mr. Clemons was alive. (Doc. 41-8 at 13).

As a result of Dr. Enstice's testimony, the CCA held that

Here, Mr. Clemons, a 77–year–old man who was 5 feet, 7 inches tall and weighed 139 pounds, left his house on the night of his death, against the protestations of his wife, to retrieve a crowbar he had loaned to Saunders earlier that day. Mr. Clemons located Saunders and found that Saunders was smoking crack cocaine

---

[33] The sentencing order also found that the remaining three aggravating circumstances on which the trial court instructed the jury were proven beyond a reasonable doubt. (Doc. 41-27 at 7). Those three included: (1) the capital offense was committed while the defendant engaged in the act of robbery in the first degree; (2) the capital offense was committed while the defendant engaged in the act of burglary in the first degree; and (3) the capital offense was committed by a person under the sentence of imprisonment. The trial court explained that it gave moderate weight to the first two aggravating circumstances, little weight to the third circumstance, and "great weight" to the aggravating circumstance of the capital offense being especially heinous, atrocious, or cruel compared to other capital offenses. (Doc. 41-27 at 7-8).

on the Clemonses' property. Mr. Clemons was then confronted by 24–year–old Saunders, who was 5 feet, 11 inches tall and weighed 180 pounds and was wielding the crowbar he had borrowed from Mr. Clemons. As the trial court noted in its sentencing order, Dr. Enstice testified that Mr. Clemons sustained numerous nonlethal injuries to his face; Mr. Clemons suffered bruises and scrapes around his eyes, nose, and mouth, and he sustained many small cuts or lacerations to the skin around his eyes and inside his lower lip. Dr. Enstice testified that these injuries were caused by several blows to his face, and that each of the injuries to the facial area was sustained while Mr. Clemons was alive. (R. 631.) Dr. Enstice also testified about extensive injuries to the deep structures of Mr. Clemons's neck. Those injuries, along with hemorrhages in Mr. Clemons's upper and lower eyelids and in the white parts of his eyes, together with the external bruises and scratches on Mr. Clemons's neck, were "indicative and very consistent with compression of the neck" (R. 634), and Dr. Enstice said that it would have required a "very, very strong force to do that." (R. 636.) The strangulation might have rendered Mr. Clemons unconscious momentarily, Dr. Enstice said, but Mr. Clemons would have regained consciousness and could have gotten up and attempted to move away. Dr. Enstice testified that the injuries to Mr. Clemons's face and neck certainly would have been painful.

Dr. Enstice determined that, although the neck compression or partial strangulation could have contributed to Mr. Clemons's death, the blunt-force trauma that fractured his skull and resulted in extensive injuries to his brain was the actual cause of death. Dr. Enstice testified that the first of the multiple, fatal blows to the head that Saunders inflicted with the crowbar was struck while Mr. Clemons was upright, either standing or kneeling, because the blood from that injury drained downward onto Mr. Clemons's neck and upper back. According to Dr. Enstice, the blood-draining pattern from the remaining blows to the head were consistent with Mr. Clemons being facedown on the ground when those blows were struck. Death would have resulted in less than a minute following the blow to the top of the head or the blow to the right side of the head, each of which caused extensive brain damage. The remaining blows to the head were inflicted close together in time, Dr. Enstice said, and around the time of Mr. Clemons's death. Those injuries would have been painful. Dr. Enstice also stated that if Mr. Clemons fell to the ground after Saunders struck him on the top of the head with the crowbar and incapacitated him, then the injuries to Mr. Clemons's face and neck had to have been inflicted before Saunders hit Mr. Clemons on the head with the crowbar.

Based on this evidence, the trial court reasonably concluded that Saunders struck the slightly built, elderly Mr. Clemons about the face repeatedly and strangled him, though not fatally, before he inflicted the fatal blows to Mr. Clemons's head. The trial court reasonably inferred that during the attack Mr. Clemons would have been in fear for his own life and for that of his elderly wife, whom he had left alone inside the house. In addition, a reasonable inference could be made that Mr. Clemons attempted to fight back against Saunders, given that the knife he kept in

the sheath on his belt was found underneath his body and the sheath was empty. While Mr. Clemons was in an upright position, either on his knees or standing, Saunders struck him on the head with the crowbar, incapacitating him. At the time of the fatal blows, Mr. Clemons would have been in extreme pain from all the injuries Saunders had inflicted on him up to that time, and in extreme fear for his own life and for that of his elderly wife, who was alone in the house. Mr. Clemons would have known that his own death was imminent because he could not overcome the attack by the younger, larger man, and he would have been aware that his wife would likely be the next victim of Saunders's violence.

Thus, we conclude that all three factors that are generally recognized as indicating that the offense was especially heinous, atrocious, or cruel are present in this case. Saunders used violence beyond that necessary or sufficient to cause death when he repeatedly struck and then strangled Mr. Clemons before inflicting the fatal blows. The initial blows inflicted by Saunders and the strangulation would have been painful and would have caused appreciable suffering. Finally, Mr. Clemons suffered extreme psychological trauma because he knew that his death was imminent and that he was be unable to protect his wife, who was alone in their house.

For these reasons, we find no error, much less plain error, in the trial court's instructing the jury on the aggravating circumstance that the murder was especially heinous, atrocious, or cruel, or in the trial court's finding the existence of that aggravating circumstance.

Saunders I, 10 So. 3d at 109–10.

Saunders's argument that death was "swift" and "by surprise" and "sudden" is contradicted by Dr. Enstice's testimony that Mr. Clemons received multiple injuries while he was alive. The prosecutor asked Dr. Enstice whether the blows caused Mr. Clemons to die instantly. Dr. Enstice testified that the blows "would not be an instantaneous death but certainly less than a minute . . . ." (Doc. 41-8 at 40). She further testified that these injuries "of th[is] severity" caused pain. (Id. at 40-41).

The evidence presented by Dr. Enstice included testimony that Saunders acted beyond what was required to kill Mr. Clemons. The evidence was sufficient to find that Saunders inflicted numerous blows that caused suffering. Dr. Enstice's testimony provided evidence from which the jury could reasonably decide Saunders's actions were heinous, atrocious, or cruel.

Saunders has failed to show that the CCA's determination of the facts was unreasonable. See Wood, 558 U.S. at 301 (holding that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance[]").

The Court concludes that the CCA's determination that sufficient evidence existed to support the instruction and trial court's conclusion that Saunders's acts were heinous, atrocious, or cruel was not contrary to or an unreasonable application of clearly established federal law. Nor was the CCA's decision an unreasonable determination of the facts. Saunders's claim that the trial court erred by instructing the jury on the heinous, atrocious, or cruel aggravating factor does not entitle him to habeas relief. The claim is **DENIED**.[34]

13. IT WAS ERROR TO DENY SUPPRESSION OF A YOUTHFUL OFFENDER FINDING.

Before Saunders testified, trial counsel made a motion in limine. (Doc. 41-10 at 2-3). Specifically, Mr. Dasinger moved that the trial court limit the use of Saunders's youthful offender conviction arising out of South Carolina. (Id. at 3). The trial court denied Saunders's

_____

[34] Saunders hints at another argument in addition to his insufficiency of the evidence argument. In paragraph 178, Saunders targets "[t]he standardless method for the imposition of the death penalty . . . ." Yet Saunders does not allege the aggravating statute is unconstitutionally vague such that a Lindsey v. Thigpen-type analysis is required. Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir. 1989). To satisfy Lindsey's limiting jury instruction requirement related to the heinous, atrocious, or cruel aggravating circumstance, the Eleventh Circuit

> has held that a "court's consideration of the 'especially heinous, atrocious or cruel' aggravating factor must satisfy a three part test." [Lindsey v. Thigpen, 875 F.2d 1509, 1514 (11th Cir. 1989)]. First, the appellate courts of the state must have narrowed the meaning of the words "by consistently limiting their application to a relatively narrow class of cases, so that their use" informs the sentencer of what it must find before it imposes the death penalty. Id. Bradley concedes that the Alabama courts have done that, and that the sentencing court in this case advised the jury of that narrowed construction. See Ex parte Kyzer, 399 So. 2d 330, 333-35 (Ala. 1981). Second, "the sentencing court must have made either an explicit finding that the crime was 'especially heinous, atrocious or cruel' or an explicit finding that the crime exhibited the narrowing characteristics set forth" in the state courts' construction. Lindsey, 875 F.2d at 1514. Third, the sentencer's conclusion as to step two "must not have subverted the narrowing function of those words by obscuring the boundaries of the class of cases to which they apply." Id.

Bradley v. Nagle, 212 F.3d 559, 570-71 (11th Cir. 2000). The Court declines the opportunity to engage, given the undeveloped nature of this argument.

motion, reasoning that if Saunders's testimony included certain items it would "open the door for the State to get into those." (Id. at 5). The trial court instructed the attorneys that

> how far the State gets to go is going to depend on what you ask your client and what your client testifies to. So I don't think I can make a ruling at this time, but I will instruct the State that if they decide to get into some of those pending charges in South Carolina or into the facts of the youthful offender conviction, that I think that's -- that's something we'll discuss when we get to that point.

(Id. at 8). Mr. Dasinger elicited testimony from Saunders regarding his participation in the South Carolina conviction during Saunders's direct testimony. During the State's cross examination of Saunders', he was asked about "the credit card" incident (from which his youthful offender charge came a result) and his culpability or lack thereof. (Id. at 53-54).

In denying trial counsel's motion, Saunders argues the trial court violated "Mr. Saunders's rights to due process, a fair trial and reliable sentencing. Because of the trial court's denial of his Motion, trial counsel was then required to bring up the Youthful Offender adjudication when Mr. Saunders testified in his own behalf." (Doc. 41-1 at 117, ¶ 180 (internal citations omitted)). He supports his claim by citing three Supreme Court cases: Taylor v. Kentucky, 436 U.S. 478 (1978), Estelle v. Williams, 425 U.S. 501 (1976), and Strickland, 466 U.S. 668.

The CCA held that

> The trial court's ruling on the motion in limine was correct. Although youthful-offender adjudications are generally not admissible, a defendant can open the door in his direct testimony and render a youthful-offender adjudication admissible in cross-examination or on rebuttal. See, e.g., Williams v. State, 695 So. 2d 644 (Ala. Crim. App. 1996) ("[T]he appellant 'opened the door' for the admission of his prior juvenile adjudications by denying that he had ever been involved in anything similar to the offense for which he was charged."), and Thomas v. State, 445 So. 2d 992 (Ala. Crim. App. 1984) (holding that although a youthful-offender adjudication may not be used to impeach credibility, when the witness opens the door by denying his criminal intent in a case, his prior youthful-offender plea of guilty to the same offense is admissible). Thus, the trial court correctly ruled that if Saunders testified that he had never been in any trouble before, then the

> prosecutor would be permitted to cross-examine Saunders about the prior
> youthful-offender adjudication.

Saunders I, 10 So. 3d at 88. It also rejected Saunders's argument that the trial court's decision in

effect forced him to choose between testifying and admitting the youthful offender adjudication

and not testifying. It relied upon Ohler v. United States, 529 U.S. 753 (2000), in holding that

there "is nothing 'unfair,' . . . about putting [a defendant to his] choice in accordance with the

normal rules of trial." Saunders I, 10 So. 3d at 90 (quoting Ohler, 529 U.S. at 759).

Here, too, Saunders's argument falls short. First of all, Strickland does not apply to this

claim, as it is not an ineffective assistance of counsel claim. Saunders's reliance upon Taylor v.,

436 U.S. 478, proves equally unavailing. In Taylor, the Supreme Court reaffirmed the

presumption of innocence principle. Id. at 483. The Court recognized that "one accused of a

crime is entitled to have his guilt or innocence determined solely on the basis of the evidence

introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or

other circumstances not adduced as proof at trial." Id. at 485. The Court held that the trial court's

refusal to give the petitioner's requested presumption of innocence instruction violated his rights

to a fair trial under the Due Process Clause of the Fourteenth Amendment. Id. at 490. Saunders

here does not claim that the trial court erred by omitting a presumption of innocence instruction;

instead he argues the trial court's motion in limine holding violated Saunders's due process

rights. He relies on no other cases for support that the trial court's decision violated his rights,

nor does he elucidate any precedent to support his argument that the CCA's adjudication of this

claim was contrary to or an unreasonable application of clearly established Supreme Court

precedent. For the foregoing reasons, the claim for habeas relief on this basis is **DENIED**.

14. THERE WAS INSUFFICIENT EVIDENCE TO CONVICT.

Saunders's next argues insufficient evidence existed to convict him. (Doc. 41-1 at 117-18, ¶ 181-182). This two-paragraph claim specifically contends no evidence was admitted to prove that Saunders intended (1) to take Mr. Clemons' life; (2) to commit murder or burglary; or (3) "to do any other criminal act." (Id. at 118, ¶ 182).[35]

The CCA held that "[t]he evidence presented by the State established all the elements of robbery-murder, burglary-murder, and attempted murder. Therefore, the trial court did not err when it denied Saunders's motions for a judgment of acquittal at the close of the State's case and at the close of all the evidence." Saunders I, 10 So. 3d at 99.

A Jackson claim (i.e., a federal habeas claim challenging the sufficiency of the evidence) has been described as facing a "high bar." Coleman v. Johnson, 566 U.S. 650, 651 (2012). For it involves "two layers of judicial deference." Id. First, a court may set aside the jury's verdict on this ground only if, viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could have agreed with the jury." Coleman, 566 U.S. at 651 (quoting Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam)). And second, a court on habeas review may only overturn a state court decision rejecting a sufficiency of the evidence challenge if the state court's decision was objectively unreasonable. Id. Saunders must successfully argue both layers to obtain relief on his Jackson claim.

Although Saunders tacitly argues the state court adjudication of this claim was an unreasonable application of Supreme Court precedent, he advances no argument in support of that cursory allegation. The Court, upon consideration of the evidence adduced at trial and viewed in the light most favorable to the prosecution, concludes rational triers of fact could agree

---

[35] In a narrower argument in Reply, Saunders argues "the State still failed to show that Mr. Saunders had the specific intent to kill Melvin Clemons that is required by capital murder." (Doc. 50 at 17).

with the jury's guilty verdict. Additionally, the state court's decision was not objectively unreasonable.

To sustain a conviction for "(2) Murder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant[,]" Ala. Code § 13A-5-40(2), the State

> must prove beyond a reasonable doubt: (1) a "robbery in the first degree or an attempt thereof," as defined by § 13A–8–41; (2) a "murder," as defined by § 13A–6–2(a)(1); and (3) that the murder was committed "during" the robbery or attempted robbery, i.e., that the murder was committed "in the course of or in connection with the commission of, or in immediate flight from the commission of" the robbery or attempted robbery in the first degree, § 13A–5–39(2). Connolly v. State, 500 So. 2d 57 (Ala. Cr. App. 1985), aff'd, 500 So. 2d 68 (Ala. 1986). The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing.

Saunders I, 10 So. 3d at 96 (quoting Jones v. State, 946 So. 2d 903, 925-26 (Ala. Crim. App. 2006)).

> [I]ntent, being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence. Intent may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances. The intent of a defendant at the time of the offense is a jury question.

Buford v. State, 891 So. 2d 423, 429 (Ala. Crim. App. 2004) (internal citations, ellipsis, and quotation marks omitted).

A review of the evidence, viewed in the light most favorable to the prosecution, indicates that the evidence was sufficient to convict Saunders of the charges. Accordingly, Saunders failed to satisfy either layer – much less both – required to successfully mount a Jackson claim. The CCA's decision was neither contrary to nor an unreasonable application of clearly established federal law. Saunders's claim is therefore **DENIED**.

15. THE STATE PROSECUTOR USED IMPROPER ARGUMENT.

Saunders argues that the State prosecutor's argument regarding the level of voluntary intoxication was improper because the trial court had refused to instruct the jury on this requirement. Trial counsel objected at the time the State prosecutor made this argument, but the trial court denied trial counsel's objection. Saunders argues the "[p]rosecutor's misconduct" in making this line of argument violated his constitutional rights. (Doc. 41-1 at 119, ¶ 185).

The CCA held that its

> review of the record reveals that when the trial court instructed the jury on voluntary intoxication it did not include the requirement that intoxication reach the level of insanity in order to negate intent (R. 1065), although that statement of law would have been correct. Furthermore, the trial court informed the jurors at the beginning of the trial that it would instruct them as to the law it was to apply to the facts of the case, and it is well settled that a jury is presumed to follow the trial court's instructions. Thus, although the prosecutor's statement to the jury that the court would instruct it that intoxication had to rise to the level of insanity in order to negate intent when, in fact, the court did not give that instruction, was technically not a correct statement based on the facts in this case, the fact that intoxication must rise to the level of insanity in order to negate intent is a correct statement of the law. Therefore, we conclude that the prosecutor's statement, which was a correct statement of the law, was not error, and the trial court properly overruled Saunders's objection.

Saunders I, 10 So. 3d at 101-02 (internal citations omitted).

A jury charge instructing the jury about the definition of voluntary intoxication, which a party requested,[36] was not given. (Doc. 41-46 at 124). That denied jury charged read as follows: "Voluntary intoxication is no defense unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure."  (Id.). Notwithstanding the trial court's indication that it would deny the requested jury charge, Ms. Newcomb, during closing arguments, made the following statement: "the Judge is going to tell you that voluntary intoxication is not a defense and that you essentially are going to have to determine that his

---

[36] Saunders I, 10 So. 3d at 101 ("there is no indication on the face of that document [indicating the trial court declined to provide the instruction] whether it was submitted by the prosecutor or by Saunders").

intoxication was such that it rose to the level of insanity and he could not form intentional[.]" (Doc. 41-12 at 24).

Saunders cited two Supreme Court cases: <u>Berger v. United States</u>, 295 U.S. 78 (1935), and <u>United States v. Young</u>, 470 U.S. 1 (1985). Although these seminal cases bear upon the Supreme Court's understanding of how a prosecutor should comport himself or herself,[37] neither case directly supports that the CCA's holding was contrary to or an unreasonable application of established federal law or a decision based upon an unreasonable determination of facts.

As to Saunders's claim that the statements amount to prosecutorial misconduct, (Doc. 41-1 at 119, ¶ 185), his argument again falls short. "To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." <u>Conner v. GDCP Warden</u>, 784 F.3d 752, 769 (11th Cir. 2015) (quoting <u>United States v. Eyster</u>, 948 F.2d 1196, 1206 (11th Cir. 1991)). "To satisfy the second prong, the prosecutor's improper remarks must have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Conner</u>, 784 F.3d at 769. "The jury is presumed to follow the instructions given by the trial court." <u>Hutcherson v. State</u>, 727 So. 2d 846, 854 (Ala. Crim. App. 1997) (citation omitted, alteration supplied). "To justify reversal because of an attorney's argument to the jury, [a] court must conclude that substantial prejudice has resulted." <u>Twilley v. State</u>, 472 So. 2d 1130, 1139 (Ala. Crim. App. 1985) (alteration supplied).

---

[37] <u>See</u> <u>Young</u>, 470 U.S. at 7 ("The line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone."); <u>Berger</u>, 295 U.S. at 88 ("[T]herefor[], in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.").

Saunders has not pleaded how the comments affected Saunders's substantial rights such that it infected the trial with unfairness. The trial court instructed the jury before the trial began that it would instruct them as to the law (Doc. 41-4 at 172). And the trial court properly instructed the jury following Ms. Newcomb's closing arguments.

The CCA's determination of this claim was neither contrary to nor an unreasonable application of clearly established federal law. Saunders's claim with respect to the prosecutor's alleged improper closing statement is **DENIED**.

16. IT WAS ERROR TO REPLACE A JUROR.

The sentencing phase began on August 31, 2005, two days after Hurricane Katrina made landfall. One juror, M.T.M. (juror # 41/Mr. McKenzie) did not appear at court when it convened to begin the penalty phase. He had appeared and participated in the guilt phase, but did not return to court on the morning the penalty phase began.

The trial court explained that it received a message that M.T.M. left to help restore power to areas impacted by Katrina and without power. At 9:10 a.m., court reconvened. (Doc. 41-15 at 16). The trial judge noted in open court that M.T.M. had not appeared. Specifically, the trial court stated

> Mr. McKenzie has not appeared this morning. We had received a message that he was helping restore power to some of the areas that were without power and may not be able to make it today.
>
> It's approximately 12 minutes after 9:00, so I do not believe Mr. McKenzie is going to be here. We had received a call yesterday on the 30th, at least my secretary had received a call yesterday on the 30th that indicated -- it wasn't Mr. McKenzie, but I think it might have been his mother, indicating that he may not be here today.
>
> So, what I had planned on doing is replacing Mr. McKenzie with one of the two alternates. Everybody is back this morning except the two -- except Mr. McKenzie. The two alternates did not deliberate on the finding of guilt. However, the two alternates were sequestered in my foyer of my office during the jury's

deliberation on guilt. They did not participate in that, but they were kept separate and were instructed to not discuss the case at that time, and as far as we know, did not discuss that case.

So at this time, I will -- it's the Court's opinion that I will -- unless somebody has a better idea, to replace Mr. McKenzie with Juror No. 47 [R.E.R.]. . . .

(Id. at 17-18).

While the State did not object to this proposal, Saunders did because R.E.R. "was not privy to the deliberations of the other people who were selected for the jury" and because Saunders's counsel deemed it improper to proceed without M.T.M.'s presence. (Doc. 41-15 at 17-18). Saunders's argues that replacing this juror without first attempting to secure the juror's attendance violated Saunders's right to due process, equal protection, an impartial jury, a fair trial, and a reliable sentencing. (Doc. 41-1 at 120, ¶ 188).

The Respondent argues that Alabama law allows "if it becomes necessary[,] for an alternate to replace a principal juror, the last juror struck shall be designated." Ala. Code § 12-16-100(c). She relies upon previous CCA authority vesting the decision to replace a juror within the ambit of the trial judge's sound discretion. (Doc. 47 at 96 (quoting Rocker v. State, 443 So. 2d 1316, 1320 (Ala. Crim. App. 1983)). The CCA on direct appeal concluded that the trial court did not abuse its discretion in replacing the juror. Saunders I, 10 So. 3d at 104 ("[A] trial court certainly has discretion under § 12–16–100(c) to replace a juror who is attempting to aid people in the aftermath of a natural disaster.").

Although Saunders argues that the decision violates his right to due process, right to equal protection, and right to an impartial jury, fair trial, and reliable sentencing, he has wholly failed to demonstrate (1) how this decision did so; (2) on what authority he relies for this cursory assertion; (3) and how the CCA's adjudication was contrary to or an unreasonable application of clearly established federal law. Such cursory assertions unsupported by citation to authority

provide little assistance to the Court in adjudicating this claim. Saunders's reliance upon Apprendi, 530 U.S. 466, is unsupportive of this claim insofar as Saunders attacks the replacement of a juror rather than the subjugation of the jury's role.

The Eleventh Circuit held in Green v. Zant, 715 F.2d 551 (11th Cir. 1983), that the petitioner "stated a colorable claim of constitutional magnitude[,]" id. at 555, in contending that the trial court erred by not investigating before dismissing a juror who, three hours into deliberations, "fell to the floor in the hallway outside the courtroom and in an audible voice repeatedly cried 'I can't do it.'" Id. at 554. See id. at 555 (holding the petitioner's Sixth Amendment right "may well have required that the trial court investigate the need to discharge juror . . . ."). The Eleventh Circuit held that "'[t]here must be some 'sound' basis upon which the trial judge exercise[s] his discretion' to remove the juror." Id. at 555 (quoting United States v. Rodriguez, 573 F.2d 330, 332 (5th Cir. 1978)). "[D]ismissal of a juror 'for want of any factual support, or for a legally irrelevant reason' is prejudicial." Id. (quoting United States v. Rodriguez, 573 F.2d 330, 332 (5th Cir. 1978)).

At the same time, the Eleventh Court acknowledged that "[i]n many cases the nature of the juror's inability will be evident to the court so that a hearing on the issue is unnecessary." Id. "A separate hearing on a juror's incapacity is not required where the juror's inability to continue is clear[] . . . ." United States v. Fajardo, 787 F.2d 1523, 1525 (11th Cir. 1986). "A juror's absence is an observable fact. His absence manifestly interferes with the prompt trial of a case. Hence when a juror is absent from court for a period sufficiently long to interfere with the

reasonable dispatch of business there may be a 'sound' basis for his dismissal." <u>Rodriguez</u>, 573 F.2d at 332.[38]

Unlike in <u>Green</u>, in which the trial court excused a juror after the jury began guilt phase deliberations and in which "circumstances of the dismissal of [the juror] raised the suggestion that her refusal to impose the death penalty was a factor in her dismissal[,]" <u>Green</u>, 715 F.2d at 556, here the jury had already concluded its guilt phase deliberations. Additionally, unlike in <u>Green</u>, where the Eleventh Circuit held an inquiry is appropriate when the juror's disability is less certain or obvious, here M.T.M. did not appear and the trial court received notice that M.T.M. would not be present due to his employment with a utility company. Accordingly, the CCA's determination of this claim was neither contrary to nor an unreasonable application of clearly established federal law, and Saunders's claim is **DENIED**.

17. THE TRIAL COURT MISLED THE SENTENCING JURY AS TO THE IMPORTANCE OF ITS RECOMMENDED SENTENCE.

At the time Saunders was convicted and sentenced to death, Alabama law permitted trial courts to override a jury's recommendation of life imprisonment and instead impose the death penalty. During the 2017 legislative session, the Alabama legislature amended the law to prohibit judicial override. S.B. 16, 2017 Leg., Reg. Sess. (Ala. 2017). As a result, the law now permits a trial court to impose the death sentence only when the jury returned a verdict of death. When the jury does not return a sentence of death, the trial court is obligated to sentence the defendant to life imprisonment without parole. Ala. Code § 13A-5-47(a) (2017).

However, this reform was twelve years in the future when the court sentenced Saunders. At that time, the statute referred to the jury's decision as "advisory." Ala. Code § 13A-5-46

---

[38] <u>See</u> <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (all decisions of the "old Fifth" Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit).

(2016). As the CCA explained on Saunders's direct appeal: "In Alabama, it is the trial judge, not the jury, who is the final sentencing authority." <u>Saunders I</u>, 10 So. 3d at 105.

The trial court's instructions to the jury before their sentencing-phase deliberations commenced reflected this reality. The court referred to the jury's decision as a "recommend[ation]" throughout the jury charges. (Doc. 41-22 at 4, 7, & 15). For example, the trial court instructed them that the State bore the burden of convincing them as to the existence of aggravating circumstances for the jury to consider "in determining what punishment is to be recommended in this case." (<u>Id.</u> at 7).

Trial counsel raised an objection to the trial court's reference to the jury's decision as a "recommend[ation]" following the instructions. (Doc. 41-23 at 3). Trial counsel's position was that despite the statue vesting ultimate decisionmaking authority with the trial judge, the jurors should understand that their decision constitutes the final verdict. (<u>Id.</u> at 3). Trial counsel's objection included a request for a curative instruction, but the trial court denied the motion in its entirety. (<u>Id.</u> at 5).

The CCA, on direct appeal, held that the trial court did not err by referring to the jury's sentencing decision as a recommendation. <u>Saunders I</u>, 10 So. 3d at 105. And the court cited a prior CCA decision for the proposition that the trial court does not commit error when it refers to the decision as a recommendation or advisory verdict: "'the trial court does not diminish the jury's role or commit error when it states during the jury charge in the penalty phase of a death case that the jury's verdict is a recommendation or an 'advisory verdict.'"" <u>Saunders I</u>, 10 So. 3d at 105 (quoting <u>Robitaille</u>, 971 So. 2d at 74).

Saunders again deprives the Court of relevant precedent to support his contention that the CCA's decision warrants habeas relief pursuant to § 2254. Nevertheless, Eleventh Circuit

precedent forecloses this argument. In <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985), the Supreme Court held that a judge during a trial's penalty phase may not impermissibly "minimize the jury's sense of responsibility for determining the appropriateness of death." <u>Id.</u> at 341. Subsequently, in <u>Romano v. Oklahoma</u>, 512 U.S. 1 (1994), the Supreme Court held that in order to constitute a <u>Caldwell</u> violation, a petitioner must show that the instructions or remarks improperly described the role to the jury by local law. <u>Romano</u>, 512 U.S. at 9. The Eleventh Circuit has further elaborated, holding that instructions are not error when "they accurately characterize the jury's and judge's sentencing roles under [relevant state] law." <u>Davis v. Singletary</u>, 119 F.3d 1471, 1482 (11th Cir. 1997).

Here, the Alabama statute defined the jury's role as an advisory one. The trial court's remarks did not violate <u>Caldwell</u> and Saunders's claim that the trial court misled the sentencing jury does not merit habeas relief. The CCA's determination of this claim was not contrary to or an unreasonable application of clearly established federal law. The claim is therefore **DENIED**.

## IV. CONCLUSION

Based upon the foregoing, the Court concludes Saunders's amended petition does not warrant habeas relief. Accordingly, Saunders's amended petition for a writ of habeas corpus is **DENIED**.

## V. CERTIFICATE OF APPEALABILTY

Rule 11(a) of the Rules Governing Section 2254 Cases provides that

The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue. If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2). If the court denies a certificate, the parties may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22. A motion to reconsider a denial does not extend the time to appeal.

In turn, 28 U.S.C. § 2253(c)(2) provides that "a certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327. And "[i]n a capital case, the nature of the penalty is a proper consideration" in determining whether to issue a certificate of appealability. Barefoot v. Estelle, 463 U.S. 880, 893 (1983).

Where a district court has rejected a claim on the merits, the petitioner seeking a certificate of appealability must establish that "reasonable jurists would find the district court's assessment of the constitutional claim [] debatable or wrong." Eagle v. Linahan, 279 F.3d 926, 935 (11th Cir. 2001) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)). However,

> [w]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. .... Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further.

Slack, 529 U.S. at 484; Lamarca v. Sec'y, Dep't of Corr., 568 F.3d 929, 934 (11th Cir. 2009). A certificate of appealability does not, however, require a showing that the appeal will succeed. Miller-El, 537 U.S. at 337. The Court "should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief." Id.

Upon review of Saunders's § 2254 petition, the Court finds that reasonable jurists would not find it debatable whether this Court was correct in denying Saunders's claims, with the

exception of Claim 1.b (Mr. Saunders's trial counsel was ineffective during the guilt phase because even if trial counsel's decision to call Mr. Saunders to testify during the guilt phase was made for strategic reasons, trial counsel's execution of that decision was ineffective at best, and, at worst, tended to establish the inference that Mr. Saunders was guilty of capital murder). The Court therefore **DENIES** Saunders a certificate of appealability as to all claims except Claim 1.b. The Court **GRANTS** a certificate of appealability as to Claim 1.b.

      **DONE** the 1st day of February 2019.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**
